JAMES LUDLUM

v.

ALICE BUCKINGHAM and JOHN M. BUCKINGHAM.

At the death of one of two partners, the firm assets consisted of large tracts of land, factories &c., mortgaged for about $100,000, and personal property estimated to be worth $120,000. A bill by the representative of the decedent charged that land standing in the name of the surviving partner had been paid for by the decedent's individual means, and also charged the surviving partner with fraud and mismanagement. The surviving partner was appointed receiver of the firm's assets, with full power to settle its affairs under the direction of the court. The survivor was found to be indebted to the firm for about $75,000, which have not yet been paid. In order to eliminate the real estate from the settlement, the survivor (the complainant) made a written proposition that he would give, or take, for the land, $30,000, and a release of the mortgages ($100,000) thereon, and deposit the $30,000 in court, as part of the firm's assets, to be disposed of by the court, with a further provision that the court should have power to enforce and carry out the contract. The representative (the defendant) agreed to purchase the land on the terms stipulated. On the day fixed for consummating the bargain, the complainant attended, with his deed for the premises duly executed, but the defendant neither tendered the $30,000 nor produced the releases of the mortgages, but

Ludlum *v.* Buckingham.

proposed instead thereof, to charge herself with $30,000 on account of her share of the surplus assets of the firm, and to indemnify the complainant against his liability for the mortgages. This proposition the complainant declined, and the court refused to compel him to accept; he also rejected defendant's proposition that he should buy the property, instead of defendant, on the same conditions. He then applied to the court to compel the defendant to perform her contract, or that the lands be sold and the defendant held liable to the estate for any loss incurred by her default. The court refused to interfere at that time, reserving the question whether relief might be granted thereafter, and, on appeal, that proceeding was sustained. The personal property of the firm was afterwards sold, by direction of the court, and about $46,000 realized. Two of the mortgages were subsequently foreclosed, and a decree for $96,000 thereon obtained. To reduce this decree, $24,000 of the money derived from the sale of the personalty was ordered by the court to be applied thereto, and, on a foreclosure sale thereafter, the premises brought $80,000, about enough to satisfy the balance due on the decree. Complainant files the present bill to charge the defendant with the personal loss which he has sustained by reason of her failure to perform her contract.—*Held,* that while equity may, in the absence of unfairness or imposition, enforce a contract by the representative of a deceased partner to purchase of the surviving partner the lands of the partnership, or may, in case such performance be impossible or impracticable, award compensation, if the complainant's remedy at law be uncertain or inefficacious, and such compensation be indispensable to his relief in equity, yet, if the complainant's action or inaction has hindered or prevented the defendant from performing his contract (as, in this case, complainant's failure to pay his own debt to the firm deprived the defendant of the means of fulfilling her contract), equity, in the exercise of its discretion, will refuse relief.

On final hearing on supplemental bill and answer, and proofs taken in open court.

*Mr. Thomas N. McCarter,* for complainant.

*Mr. John M. Buckingham* and *Mr. E. Q. Keasbey,* for defendants.

VAN FLEET, V. C.

The original suit in this case was brought by Alice Buckingham and her husband, John M. Buckingham, against James Ludlum. Subsequently, leave was given to Mr. Ludlum to file

a supplemental bill against the Buckinghams, and the questions now to be determined arise on the bill filed under such leave.

For more than twenty years prior to the 9th day of June, 1874, James Horner and James Ludlum had been engaged in the manufacture of steel, files and augers, as copartners, under the name of J. Horner & Company. Mr. Horner died on the date last named. He left a will by which he gave the bulk of his estate to his daughter, Mrs. Buckingham, and constituted her his sole executrix. The provisions of his will were : first, a direction that his sister Eliza should be paid $1,000 a year during her life ; second, a devise was made to the Episcopal Church at Pompton, of his interest in about an acre of land on which their church edifice then stood; third, a devise was made to Mrs. Ludlum, the wife of his copartner, of his interest in a tract of land, not to exceed three acres, on which she was then erecting a dwelling ; and then, all the rest and residue of his estate, both real and personal, was given absolutely to Mrs. Buckingham, except, to quote the will *in hœc verba :*

" One-fourth part of the same she is to hold in trust for the sole use and benefit of my daughter Susan during her natural life; and having full confidence in the love and affection of my daughter Alice for her sister Susan, I nominate and appoint her the sole guardian and trustee of her sister Susan, giving her full power and lawful authority to manage her property, and to sell and dispose of the same, by deed or otherwise, and to care for her in all respects, as in her judgment she may think best."

The will further directed that the business of the partnership should be carried on until such time as, in the judgment of the executrix, it could be disposed of, or wound up, with advantage to the testator's estate, and to that end the executrix was given full power and authority to join the surviving partner in any bargain, sale or conveyance necessary for the interests of the firm, and to do all things necessary to carry the same into effect.

At the time of Mr. Horner's death, the firm owned about five hundred acres of land at Pompton, in the county of Passaic, on which there were mill-streams, water-power, factories and dwellings. These lands were subject to three mortgages, on which there was then due about $100,000 of principal. The

firm also owned another tract of land, situate at Elizabethport, in the county of Union, containing about four acres. They also owned personal property estimated to be worth $120,000.

On the 21st day of August, 1874, Mrs. Buckingham filed her bill in this court against Mr. Ludlum, charging that the lands standing in the names of the individual members of the firm had been purchased by Mr. Horner, with his individual means, and also charging Ludlum with frauds and misconduct in the management of the affairs of the firm, both before and since Mr. Horner's death, and praying that he might be enjoined from exercising any power or authority over the partnership effects; also, for the appointment of a receiver, an accounting and the settlement of the partnership affairs. An injunction was granted, and an order to show cause made, requiring Mr. Ludlum to show cause why a receiver should not be appointed. On the coming in of Mr. Ludlum's answer, and, after argument, the injunction was dissolved and the order to show cause discharged. This order was made November 17th, 1874. A receiver was nevertheless appointed. The order dissolving the injunction and discharging the order to show cause, recites that it appeared to the court that the rights and interests of both parties would be promoted by having Mr. Ludlum act under the direction of the court in his future proceedings in settling and closing up the affairs of the partnership, and he was, for that reason, with his consent, and on motion of his own counsel, appointed receiver of the partnership assets. Power was given to him to collect and receive all moneys and property belonging to the firm, and to retain possession of all the assets of the partnership. This was done, the order declares, with a view to the ultimate settlement of the partnership affairs under the direction of the court.

The issues raised by the original bill and the answer thereto were subsequently tried before Vice-Chancellor Dodd, sitting as special master, and resulted in a decree which finds that, on its dissolution, the firm was indebted to Mr. Horner in the sum of $476.01, and that Mr. Ludlum, at the same date, was in-

Ludlum v. Buckingham.

debted to the firm in the sum of $73,975.47. The decree directs that after the payment of the debts, and before a division of the assets is made, Mr. Ludlum shall pay into the firm the sum of $73,975.47, with interest from June 9th, 1874, and that Mrs. Buckingham, as executrix, shall receive the sum of $476.01, with interest from the date last named. This decree was made August 22d, 1876.

More than a year prior to the making of this decree, the parties entered into the contract which is the subject of the present controversy. Prior to the 26th day of April, 1875, it had been suggested that the adjustment of the partnership affairs would be greatly simplified, and the interests of the parties promoted, if an arrangement could be made by which the real estate would be eliminated from the settlement. For the purpose of making an attempt to effect such an arrangement, Mr. Ludlum and Mr. Buckingham met at the chambers of the vice-chancellor on the date last named, when Mr. Ludlum made, verbally, the following offers, which were reduced to writing and handed to Mr. Buckingham:

"April 26th, 1875, Mr. Ludlum makes these alternative offers:

"1. Either party to say what he will give or take for the Pompton real estate, excepting the Cape May property, the party making such offer to take the Elizabethport property as a consideration for making such offer.

"2. Mr. Ludlum will give $2,500 in addition to the Elizabethport property to Mrs. Buckingnam, if she will offer to give or take a certain price for the Pompton real estate, except Cape May, and also all the unfinished personal property thereon.

"The above to be carried out in good faith; details, as to time and mode of payment, to be agreed on and fulfilled fairly."

On the 10th of May, 1875, the Buckinghams, by letter, accepted Mr. Ludlum's first proposition; that is, they agreed to convey to him the real estate situate at Elizabethport, on condition that he should name a price for the real estate belonging to the firm, situate at Pompton, which he should be bound to give or take as Mrs. Buckingham should elect. On the 9th of June following a written contract, expressing in detail the agreement thus made, was formally executed. It provided that the Buckinghams should, on or before the next day (June 10th), execute

a deed to Ludlum for the Elizabethport real estate, and leave the same with the vice-chancellor, to be delivered to Mr. Ludlum when he fulfilled his part of the agreement. Mr. Ludlum then bound himself to make, within two weeks from the date of the agreement, and leave the same with the vice-chancellor, a written offer for the Pompton real estate, which he should be obliged to give or take, as Mrs. Buckingham should elect; and Mrs. Buckingham bound herself to make such election, in writing, on the day following that on which Mr. Ludlum deposited his offer. The agreement then provided that the vice-chancellor should fix a day when the parties should meet to perform the contract, and also designated what instruments should be executed to carry the contract into effect. It also declared that the consideration to be paid for the conveyance of the Pompton real estate should be understood to represent the firm's interest in the land, and that it should be deposited in court and be disposed of by its order. The concluding stipulation of the agreement is in these words:

"The object and intention of the covenants and agreement herein contained being, as heretofore stated, to eliminate from the chancery proceedings all questions touching the disposition and sale of the real estate of the late firm of J. Horner & Company, it is hereby agreed between the parties that the court shall have the power to issue any order necessary to enforce the terms and conditions hereof."

Mr. Ludlum, within the time limited, made his offer. He offered to procure releases from the mortgagees of their debts, and to pay $30,000 in cash. Mrs. Buckingham at once elected to purchase the real estate on the terms of Mr. Ludlum's offer. The 12th of July, 1875, was fixed as the day on which the parties were to meet to perform the contract. They met, and Mr. Ludlum delivered a deed to Mrs. Buckingham, in fulfillment of the contract on his part, but Mrs. Buckingham neither paid the $30,000 nor produced releases from the mortgagees; but proposed, as a substitute therefor, to indemnify Mr. Ludlum against his liability for the mortgage debts, and to charge herself with $30,000, on account of her share of the surplus assets of

Ludlum v. Buckingham.

the partnership. Mr. Ludlum refused to consent to the performance proposed. Mrs. Buckingham afterwards applied to the court for an order directing that the deed be delivered to her, on her making such so-called substituted performance. Her application was denied. She then proposed to Mr. Ludlum that he should change places with her—let her become the vendor and he the purchaser—but this he also declined.

Subsequently, in July, 1876, Mr. Ludlum presented a petition to the court, praying that Mrs. Buckingham might be required to perform her contract, or, in case she still refused to do so, that the contract should be declared to have been broken, and, in that event, that the lands should be ordered to be sold, and Mrs. Buckingham be decreed to be answerable for any loss the partnership estate might suffer in consequence of her failure to keep her contract. Mrs. Buckingham answered this petition, and the question thus raised was decided by an order made August 29th, 1876. By this order present or immediate relief was denied, and the question whether relief should be given at all, was reserved for future consideration. This order was subsequently affirmed on appeal.

The court, on the 13th of August, 1876, at the instance of the Buckinghams, and against the opposition of Mr. Ludlum, made an order directing the personal property of the firm to be sold. It appears, from its recitals, that it was made, in part at least, to enable Mrs. Buckingham to perform her contract. Pursuant to this order the personal property was sold in the months of November and December, 1876, for about $46,000, being $74,000 less than the parties had previously estimated it to be worth.

Separate suits to foreclose two of the mortgages covering the Pompton real estate, were commenced June 22d, 1875. These suits were afterwards consolidated, and a final decree made in the consolidated action April 5th, 1876, for $96,209.23. Subsequently, $24,000 of the proceeds of the sale of the personal property was, by order of the court, applied in reduction of this decree, and on the 5th of July, 1877, the entire mortgaged premises were sold, under the decree, for a sum just sufficient to

satisfy the balance due on it.   The sum realized by the sale was
about $80,000.

The preceding narrative gives all the material facts of the
various transactions which have resulted in the present demand
by the parties for a judgment on their rights.   They have been
stated with unusual fullness and in studied detail, in consequence
of their multitude and intricacy, and the novel character of the
case.

The main object of the supplemental bill is to procure a decree
adjudging that Mrs. Buckingham shall be charged, in the final
adjustment of the partnership affairs, with such sum as will
compensate Mr. Ludlum for the loss he has suffered in conse-
quence of her failure to perform her contract.   He insists that
by her failure to keep her contract the partnership estate has
suffered a loss of $54,000.   The argument by which he demon-
strates the truth of this allegation is as follows:   He says the
contract required Mrs. Buckingham to discharge the firm from
the whole of their mortgage debt, and to pay $30,000 in addi-
tion ; so that performance by her of her contract duty would
have given the partnership estate $30,000 for the value of its
equity of redemption, which is now lost, and left untouched
$24,000 realized from the sale of the personal property, which is
now also lost.   The half of the aggregate of these two sums,
together with the whole of such expenditures as have been neces-
sarily made since her failure to perform, for the care and preser-
vation of the property, he claims as the compensation which he
is entitled to recover against the defendants.

The defendants deny his right to any relief whatever.   They
present a multitude of reasons why his whole prayer should
be denied.   Those possessing sufficient merit to require consid-
eration may, I think, be grouped under three heads, and stated
thus :  First, it is contended that the contract is unenforceable in
equity, because it was made by a trustee with his cestui que trust ;
second, it is said the complainant's claim is not the fit subject of
equity cognizance, because, in the present posture of affairs, if he
is successful in his suit, he must take a decree simply for dam-
ages, and that that is a species of relief which a court of equity

is incompetent to give; and *third,* it is insisted that, in view of all the circumstances of the case, especially in view of the fact that the complainant has withheld from the partnership estate, for years, a sum more than double that which Mrs. Buckingham was required to pay, it would be manifestly inequitable to give him the relief he asks.

That the relation of trustee and *cestui que trust* existed between Mr. Ludlum and Mrs. Buckingham, both before and after his appointment as receiver, is a fact that cannot be denied. A surviving partner is trustee both for the creditors of the firm and the representatives of his deceased copartner. So it is also unquestionable that a trustee, with authority to sell, can, in no case and under no circumstances, without the permission of the court, become the purchaser of the property he is entrusted to sell, so as to acquire a title which he can maintain against his *cestui que trust.* This is a familiar rule, and the considerations of justice and policy on which it rests are so obvious that they need not be stated. But this rule does not seem to me to have any application whatever to the case in hand. The contract sought to be enforced is not a contract for the sale of the trust property either by the trustee to himself or by the *cestui que trust* to the trustee, but an affair of an entirely different character. It is a sale by a trustee of a part of the trust property to his *cestui que trust.* But what of that? True, it was made pending a litigation between the *cestui que trust* and her trustee, concerning the trust property, but what rule of law or policy inhibits such a transaction, provided it is fair and free from fraud? The law, in its anxiety to protect the interests of *cestuis que trust,* demands that trustees shall be scrupulously frank and just in all their dealings with them, but it does not go to the length of absolutely interdicting them from contracting with each other. The courts examine such contracts with a jealous scrutiny, especially when it appears that the parties did not deal at arm's length, but that the *cestui que trust* dealt, reposing great confidence in the trustee; but even in such cases, if it clearly appears that the transaction was fair, that no advantage was taken, and that no concealment was practiced, the court is bound to uphold the contract.

The suit in which Mr. Ludlum was appointed receiver was purely an *inter partes* affair; neither the public nor the state had any concern in it.   The parties being *sui juris*, were at liberty to discontinue the suit at their pleasure.  Who doubts their right at any time during the pendency of the suit to make any contract which they might have thought it judicious to make, in adjustment or compromise of the matters in litigation, and that, if it was free from fraud, it would have been binding upon the parties?   If they could have made a valid contract for the settlement of *all* matters in. dispute, they unquestionably had a right, by the same means, to withdraw from the litigation any one of the subjects of dispute.   It is as true in law as it is in mathematics, that the greater always includes the lesser.

Now while it is true that a surviving partner, who is also one of the executors of his deceased copartner, cannot make a contract with his co-executors, for the purchase of his dead copartner's share of the partnership assets, which he can enforce against the beneficiaries under the will of his dead copartner, because in such a transaction he must assume two characters so radically opposite in their duties and interests that the law will not permit the same person to represent both (*Colgate's Exr.* v. *Colgate, 8 C. E. Gr. 372; Burden* v. *Burden, 1 Ves. & B. 170; Cook* v. *Collingridge, 1 Jac. 607*), yet there is no rule of equity which prohibits a surviving partner, standing simply in that character and unentangled by the duties of an executor or administrator to his deceased copartner, and dealing fairly, suppressing nothing and concealing nothing, from purchasing from the representatives of his deceased copartner his share of the partnership assets. In such a transaction there may be a dangerous inequality of knowledge in respect to the subject of the contract with which the parties enter upon the negotiation, but unless it is shown that the surviving partner has taken advantage of his position, by concealing facts which he ought in fairness to have disclosed, or practiced some other unfairness, he is entitled to the benefit of his contract.   To justify the court in annulling a contract made by parties holding such relations, fraud or unfairness must be shown ; they are not prohibited from contracting with each other

by the mere fact that a trust relation exists between them. *Chambers* v. *Howell, 11 Beav. 6 ; Lewin on Trusts 443 ; 1 Lead. Cas. in Eq. 216.*

If the representative of a deceased copartner may make a valid contract of sale to the surviving partner, there would seem to be no reason, when the position of the parties is reversed, and the representative is the purchaser and the survivor is the seller, why their contract should not be equally efficacious. Such contracts, whether the purchase be made by one party or the other, violate, according to my understanding of legal principles, no rule of policy or justice. If they are fair and free from fraud, I know of no reason why they should be considered even voidable.

Such, I think, I am bound to understand was the view taken of this contract by the judge who first passed upon the question whether it should be specifically performed or not, and also by the court of errors and appeals. That question, it will be remembered, was first dealt with by Vice-Chancellor Dodd, sitting as special master. He refused to enforce the contract, but his refusal was not absolute or final, but only temporary. The question whether relief should ultimately be given or not, was reserved for future consideration. His judgment was affirmed by the court of errors and appeals. *Buckingham* v. *Ludlum, 2 Stew. Eq. 345.* The appeal was argued by eminent counsel, distinguished alike for learning and acumen. No hint is given in the opinion of the court that anybody at that time had intimated the slightest doubt respecting the validity of the contract. In a case of such unusual character and great importance, I regard it as quite impossible that a question of such high concern should have escaped the consideration of both court and counsel.

Assuming, for the present, that the complainant has a meritorious case, the second question presented for decision is, Can this court give him relief? Actual specific performance of the contract in all its parts cannot be decreed. Two of the mortgages which Mrs. Buckingham stipulated to have released, have been discharged by the sale of the mortgaged premises under the decree of this court. The general rule undoubtedly is, that

a court of equity will not entertain a suit for damages purely, but this rule has its exceptions. In actions for specific performance, or in actions of like nature, where the power of making compensation is indispensable to avoid multiplicity of suits, or to work out, with completeness, an equitable result, it has been held that a court of equity may properly give relief in damages. *Copper* v. *Wells, Sax. 10; Palys* v. *Jewett, 5 Stew. Eq. 302.*

In actions for specific performance, it seems to be settled that where the defendant has, pending the suit, deprived himself of the ability to perform, or where he has, before suit, disabled himself to perform, without the knowledge of the complainant, and the complainant brings his suit in good faith, believing that the defendant can perform a decree for specific performance, or where the complainant establishes a case clearly showing that he is entitled to equitable relief, and it appears that he has no remedy at law, or that his legal remedy is precarious, equity, although it cannot enforce specific performance, will nevertheless retain jurisdiction, and give damages or compensation, either by estimating them itself, or by awarding an issue of *quantum damnificatus.* *Morss* v. *Elmendorf, 11 Paige 277; Wiswall* v. *McGowan, 1 Hoffm. Ch. 126; Milkiman* v. *Ordway, 106 Mass. 232; Phillips* v. *Thompson, 1 Johns. Ch. 131.* And it has also been held that equity should not take jurisdiction in any case in which it appears that the defendant has deprived himself of the ability to perform in advance of the institution of the suit, and this fact was known to the complainant when he brought his suit, for in such case, it is said, the complainant knows when he sues that he cannot have actual specific performance, and that his suit is simply a suit for damages. *Hatch* v. *Cobb, 4 Johns. Ch. 559; Kempshall* v. *Stone, 5 Johns. Ch. 193; Morss* v. *Elmendorf, supra.*

The doctrine last stated seems to be questioned in *Milkiman* v. *Ordway, supra.* It is there adjudged that jurisdiction in any case is established when it is determined that the complainant is entitled to equitable relief. Relief may then be given in the alternative, by awarding damages, unless the defendant shall specifically perform. The court say : " In many cases this would

Ludlum *v.* Buckingham.

be an effective and proper course, inasmuch as the defendant, although not having at the time the title or capacity requisite for performance, may be able to procure it. The jurisdiction is not lost when the court, instead of such alternative decree, determines to proceed directly to an award of damages or compensation. The peculiar province of a court of equity is, to adapt its remedies to the circumstances of each case as developed by the trial. It is acting within that province when it administers a remedy in damages merely in favor of a party who fails of other equitable relief, *to which he is entitled, without fault on his own part."* This view, in my opinion, is founded in good sense, and is supported by sound logic, and, as a rule of justice, will much more surely effect its object, in the majority of cases, than its opposite.

The rule deducible from the authorities, I take to be this: In actions for specific performance or kindred actions, a court of equity may always, when the compensation or damages can be ascertained by a simple calculation, give relief in that form, where such relief is indispensable to the working out, with completeness, of an equitable result, or the right to relief is a matter purely of equity cognizance, or the remedy at law is precarious or extremely difficult.

Taking this rule as the best, I think there can be no doubt that, in this case, if it shall appear that the complainant is entitled to relief, this court is competent to administer it.

This brings us to the test question of the case: Is the complainant, in view of all the facts, entitled, as a matter of clear equity, to a specific performance of this contract? The remedy by specific performance is discretionary. The question in such cases is not what must the court do, but what, in view of all the circumstances of the particular case, should the court do to effect justice. Its discretion must be governed by established principles of justice and not by caprice or sentiment. As relief of this nature is a thing resting entirely in sound discretion, it has become a fixed rule of judicial action never to grant it unless it is strictly equitable, under all the circumstances of the case, to do so. *1 Story's Eq. Jur.* § *750.* Hence, it requires much

less strength of case to defeat than to succeed in such an action. *Id.* § *769.* In deciding whether relief shall be given or not, the court must not only scan the contract and the circumstances which led to it, but it must also consider the character and relation of the parties. The fact that the parties held confidential or trust relations at the time the contract was made, is sometimes decisive, of itself. The conduct of the parties 'must also be carefully examined. The party asking specific performance, to be entitled to relief, must always appear to have been honest and just in the transaction. Lord Redesdale, in *Harnett* v. *Yeilding,* *2 Sch. & Lef. 549,* declared that the courts have constantly held that the party who comes into equity for a specific performance, must come with perfect propriety of conduct. And Sir William Grant, master of the rolls, said, in *Cadman* v. *Horner, 18 Ves. 10,* that a party seeking specific performance, to entitle himself to relief, must be liable to no imputation in the transaction.

When the contract sought to be enforced was made, the subject of it, as well as the parties to it, were in this court. The complainant had possession of the subject of the contract, as the officer of this court. The court had taken possession of it for the purpose of protecting, defining and adjusting the rights of the parties to it, and, if necessary for the accomplishment of those ends, to sell and convey it. The contract was undoubtedly intended by the parties to supersede the action of the court in disposing of the partnership real estate, and for that reason should be regarded as a step in the settlement of the partnership affairs, then proceeding under the direction of the court. The $30,000 required to be paid by the contract, was not to be paid to the complainant, but into court. The complainant had no right to the possession of the money, nor to control its disposition. The money was not due to him, nor payable to him, but was due to the partnership estate, and was to be paid into court, to be disposed of by its order in such manner as the interests of the partnership estate should require. At the time it became Mrs. Buckingham's duty to pay the $30,000, it is important to understand what were the duties and obligations of the complainant to the partnership estate. He was not simply surviv-

ing partner, but he stood charged also with the duties of receiver. He occupied a position where the law imposed upon him the duty of making the protection of the interests of the partnership estate his supreme object, and to sacrifice every personal interest that stood in the way of the faithful performance of that duty. When it became Mrs. Buckingham's duty to pay $30,000 into the partnership estate, the complainant was already liable to that estate for over $75,000. His debt represented partnership assets, and the court, in dealing with this matter, must treat him as though he, at that time, held in his hands funds belonging to the partnership to an amount exceeding $75,000. He was bound to use this money in such manner as would best protect and promote the interests of the partnership estate. Unless it is assumed that the contract is a fair one, so just in all its parts that the court would have approved it had its approval been asked, the complainant has no right to be heard. If we make this assumption, it is clear that it was his duty to use the funds in his hands to help Mrs. Buckingham fulfill her contract. It is certain he could not stand still, with the money in his pocket, and let ruin overwhelm the estate. If it was required for the discharge of the partnership liabilities, he was bound so to apply it; if it was not, the half of it then belonged to Mrs. Buckingham, and he was bound to pay her in order to enable her to do what he now complains of her for not doing. There would be neither conscience nor honesty in a claim that he could unjustly withhold from her the means of fulfilling her contract, and still hold her liable for damages for its non-fulfillment. His duty to guard and protect the partnership estate, as well as his duty to protect a person holding to him the relation of *cestui que trust,* deprived him of the right to fold his arms and let her take care of herself. He was bound to help her to the extent of the means under his control. He does not pretend that he did this.

But is the complainant free from all responsibility for the losses of which he complains? It is not denied that the value of the firm's equity of redemption in the lands, which, by the contract, was estimated at $30,000, has been lost. The lands have been sold for just sufficient to pay the mortgage debts.

But is Mrs. Buckingham alone to blame for this result? She agreed, it is true, to procure releases to the firm of the debts for which the lands were sold, and failed to perform her agreement. But why did she fail? Was it not because the complainant unjustly neglected to apply the moneys in his hands, belonging to the partnership, to the benefit of the partnership, and stubbornly refused to extend to her the aid and assistance which good faith and fair dealing made it his duty to give? He had at that time over $75,000 of the firm's money in his hands, and he has it still. Can there be any doubt that, had he applied it as his duty required him to do, Mrs. Buckingham would have performed her contract? While a delinquent himself in a sum so stupendous, he has no right to charge that the losses the partnership estate has sustained shall be attributed wholly to the delinquency of another, and that that other shall not only bear her own share of the loss, but his too.

The total debt of the firm at Mr. Horner's death, on all accounts, it is said, amounted to about $130,000. The complainant's debt to the firm, at the same time, was over $70,000. So that if he had performed his duty to the firm, it would have had the means of reducing its debt below $60,000. On accepting the receivership, it was his duty at once to apply this sum in discharge of the obligations of the firm. It may be said it was not then ascertained, but it should have been. His position in the firm and his control over its accounts, made it his duty to have the books free from all obscurity as to the amount of his indebtedness. His failures in duty have, in a large degree, if not entirely, produced the consequences of which he now complains. His grievances are the result, in part, at least, of his own delinquency. This fact disentitles him to relief. His bill must be dismissed, with costs.