On March 31st, 1933, defendant insurance company issued to complainant a policy of disability insurance covering the "term of twelve months beginning on the 31st day of March, 1933, at twelve o'clock noon," in consideration of a premium of $196.35. The policy contained the provision that the insured should have the "right to continuously renew this policy from year to year upon payment of the premium on or before the anniversary date," (until he arrives at age 60).
The policy further provides that "all premiums hereunder are payable on or before the specified dates, at the Home Office of the Company * * *" (which was in Boston, Mass.); that such premiums are payable annually in advance "or may be paid in regular instalments at the rates and on the dates stated on page 3 of this policy;" the payment of any premium or instalment "shall not maintain this policy in force beyond the date when the succeeding premium or instalment thereon becomes payable;" the dates and rates of premium payments are stated as follows:
"Annual premium $196.25. Payable March 31.
Alternative Modes of payment * * * Quarterly instalments $52.00 each; payable on March 31, June 30, Sept. 30 and Dec. 31." *Page 422 
Complainant chose to pay the future premiums quarterly, and continued thereafter to mail checks for the $52 quarterly payments to the company at its home office in Boston, prior to each of the quarterly payment dates as specified in the policy; which checks were duly received and accepted by the company up to the check mailed March 30th, 1937.
Defendant rented from the government and maintained a special mail box at the Boston post office into which all of its incoming mail was placed by the postal authorities, and such mail was thereafter from time to time removed therefrom by an agent or messenger of defendant and conveyed to the main office of defendant.
The letter containing the check last mentioned arrived at the Boston post office on March 31st, 1937, and was put into defendant's said post office box on that day at a time subsequent to twelve noon and subsequent to the close of business hours of the defendant. It was not conveyed therefrom by defendant's messenger to defendant's main office until the next day, April 1st; and on that day defendant sent it back to complainant stating that it refused to accept it because it had not been received until April 1st, and stating further that the policy had become automatically terminated because of the failure to make the premium payment on or before March 31st. Defendant thereafter has continuously refused to accept any premiums, and asserts and maintains that the policy is not in force and has not been in force since March 31st, 1937.
All of these facts are set up in the bill and admitted in the answer, — or in the stipulation filed at the hearing on the motion to strike the answer.
The bill prays decree reinstating or establishing the policy as being still in full force and effect and for specific performance thereof according to its terms.
The defenses under the main answer are:
1. That the policy, under its terms, automatically expired at twelve noon on March 31st because the premium (concededly) had not been received up to that hour on that date.
2. That at any rate the policy expired at midnight on March 31st, because the premium had not been received by defendant up to that hour; because *Page 423 
(a) delivery into defendant's post office box was not delivery to defendant at defendant's home office, nor equivalent thereto; and
(b) delivery even into defendant's main office, after the close of defendant's business hours, would not constitute valid delivery on that date.
As to point 1, the defense must fail. Assuming, (but not deciding), that under the policy provisions (as hereinbefore set forth), the first year's coverage expired at noon on March 31st, 1934, and that in order to effectuate a valid renewal for a period subsequent to that date and hour, the renewal premium must have been paid prior to that hour of that date, — nevertheless the policy's terms do not provide, either expressly nor by necessary or natural implication, that future renewal premiums must be paid before noon on the renewal dates.
The policy says the insured shall have the right to continuous renewal from year to year upon payment of the premium on * * *the anniversary date. It further specifies that the premiums, instead of being paid annually, may be paid in regular instalments on the dates stated on page 3 of the policy. That statement provides that quarterly payments are payable on March 31st, June 30th, September 30th and December 31st. In none of these provisions is there any statement or indication that it is requisite that such payments be made before noon on those days. If such had been defendant's intent, it could easily and clearly have so stated by the addition of two words.
The policy further goes on to state that the payment of any premium or instalment shall not maintain the policy in force beyond the date when the succeeding premium becomes payable. It does not say "noon on the date" or anything else to that effect.
Moreover, the policy does not by any means expressly and specifically state that the first year's coverage would expire at noon on March 31st, 1934; it says that it insures for "twelve months beginning on March 31st, 1933, at twelve o'clock noon." It could easily have said, but does not, "and *Page 424 
ending at twelve o'clock noon on March 31st, 1934." It is a matter of great doubt, to say the least, that (if the issue were here presented) it should or would be so construed. It is well established by the decisions in this state that the policy is to be construed most strictly against the company; and it is further established that ordinarily the law takes no account of parts of a day.
True it is that the law will take account of parts of days, where it is essential so to do in order that justice may be done. It would take account of the fraction of the day in the present instance, if the policy terms specified that the premium must be paid before noon on the specified days; but the policy does not so provide. It is perfectly obvious that it may well have been deemed important by the company to fix a particular hour for the commencement of the coverage period, but of little or no importance whether that period continued for only exactly twelve months or for twelve months plus twelve hours.
It is concluded that under the provisions of the contract in question, the policy was not terminated at twelve o'clock noon on March 31st, 1937; that it did not terminate, if at all, until midnight of that day; that if payment of the renewal premium was made prior to midnight on that day, the policy thereby became automatically renewed and there was no termination thereof.
As to defense 2, (see ante), — it too must fail. Defendant's contention (a), — that delivery of the check into defendant's post office box was not delivery at its home office, nor equivalent thereto, — cannot be sustained.
Defendant does not contend that delivery of the check, if made at the requisite place and within the requisite time, would not constitute payment. It is of course a matter of common knowledge that practically all payments of premiums on such insurance policies are made, and are expected by the company to be made, by check sent in by mail. It is not expected that, — except perhaps in a comparatively few exceptional *Page 425 
instances, — policy-holders will personally call at the company's office, (or at the office of an authorized agent), and make payment in cash; nor that they will make such personal calls to present checks. There is no provision in the policy that payment must be made in cash or legal tender; nor that, if made by check, payment shall not be deemed to have been made until collection has actually been made on the check. Defendant had always accepted complainant's checks in payment.
It seems clear, therefore, that the receipt by defendant, at its main office during its usual business hours, and prior to the expiration of the time prescribed by the policy, of an envelope containing check of the proper amount (subsequently paid in due course by the bank on which it is drawn), would constitute legal payment, — whether such check was so delivered by the policy-holder in person or by the postman as his agent. Defendant indeed so concedes, at least impliedly. Defendant did not refuse to accept the attempted payment on the ground that it was made by check and not in legal tender; and it does not (and could not) now make any contention based on that argument, that the attempted payment was not valid and effective. The payment was valid and effective, if the check was delivered at the requisite place within the requisite time.
The next inquiry is as to the place of such delivery. The policy provides that it shall be "at the Home Office of the Company or to a duly authorized agent presenting the (company's) official receipt." The policy contains no statement of the address or location (even as to the city in which it is located); but it appears by the pleadings that the home office was located in Boston, Mass. It is a justifiable assumption (from the nature of the company's business) that that "Home Office" comprises quite a number of separate rooms; also that it there receives a very considerable amount of mail daily; also that one of such rooms is used specifically for the purpose (possibly interalia), of receiving and handling incoming mail. The policy specifies no particular room and no particular person to whom payment must be made. *Page 426 
Assuredly if the envelope containing the check were delivered by the postman (plaintiff's agent) into that room, or into whatever room defendant had designated for him so to do, valid and complete delivery (so far at least as place is concerned) would thereby have been made. This would of course still be true even if the room so designated for the postman to make delivery was a room separate and apart, — and even on an entirely different floor of an office building, — from the other rooms occupied by the company as its main offices. The delivery to, and receipt by, the company, at its home office, would be made when the postal officials delivered it into the place which had been designated by the company for such delivery and receipt of mail addressed to its home office. In the instant case, defendant rented and maintained a private box at the Boston post office, into which, by its direction, the postal officials placed all incoming mail of the company addressed to it at its home office. Clearly delivery to the company would be valid and complete, by the placing of a letter so addressed, into that box, by the postal officials, — just as much as if it had been delivered by a government letter carrier into the separate room in its office building, as above mentioned.
Concededly (by the stipulation of the parties), the envelope containing the check in question was placed in defendant's said private mailbox on March 31st, at an hour some time after the close of business hours of defendant, (i.e., five P.M.) but before midnight. For the reasons hereinbefore set forth, delivery of the premium to defendant was then and thereby made. The final question is, was that delivery within such time as to effectuate, under the terms of the policy, a binding renewal or extension of the defendant's obligations under the policy?
Defendant contends that even if (as is hereinbefore decided) the terms of the policy did not require the payment to be made prior to noon on March 31st, 1937, such payment was in any event required to be made prior to the close of defendant's business hours on that date. The policy however contains no expression of such a requirement, nor any language *Page 427 
from which it could reasonably be inferred. The limitation for which defendant contends can only be rested upon usage or custom, — unless it is to be implied as matter of law, generally. No such usage or custom is pleaded. Is the limitation to be implied as matter of law?
It is true that the time for payment of premium, as limited in an insurance policy, is of the essence of the contract and the insured will be held to strict performance. Catoir v. AmericanLife Insurance and Trust Co., 33 N.J. Law 487; Hudson v.Knickerbocker Life Insurance Co. of New York, 28 N.J. Eq. 167;Leonhardt v. Massachusetts Accident Co., 124 N.J. Eq. 113,199 Atl. Rep. 896. As hereinbefore determined, however, under the terms of this policy, the time limited for payment did not expire until midnight on March 31st. The policy gave complainant the whole of that day in which to make the payment; and hence if he made the payment at any moment up until midnight, the policy obligations would be automatically continued or extended.
It cannot justly be contended that the payment must, in order to be effective, be made "before the close of defendant's business hours" on that day. Defendant might, on that particular day, have closed its offices at noon, for some special reason of its own (such perhaps as the death of its president). Under such circumstances it would seem that, in equity, if complainant had gone to defendant's offices, say at two P.M., ready, able and intending to make the payment, defendant would be estopped to set up the defense that the payment had not been made in due time. Whether such an estoppel would arise if complainant arrived at five-thirty P.M. and found the offices closed, would be a different and perhaps more doubtful question, although a great many concerns keep their offices open until six P.M. However, it is not necessary to decide this question.
Let us assume (but without deciding) that notwithstanding the policy gives all of March 31st on which to make the payment, defendant was under no duty to keep its offices open (in order that complainant might make payment) beyond five P.M. on that day. Assume also that defendant did not *Page 428 
maintain any private box at the post office. Under such circumstances, if complainant went with his check to the company's office at six P.M. and found them closed and unoccupied (and with no letter slot opening into them), he would not be able to make payment, and no payment would be made (either in fact or by estoppel). On the other hand, if complainant went back again at (say) eleven P.M. and found the company's treasurer (who had happened to stop in at the office for some private purpose) in the act of closing the office door, and tendered the check to him, payment would have thereby been made.
In other words, under the assumption above made as to the legal effect of the policy, a valid payment could and would be made between five P.M. and midnight, if complainant was actually able to effect a physical delivery to the company at its office; although complainant would have no just cause for complaint if he found himself unable to make such delivery between those hours. The terms of the policy do not expressly require the payment to be made prior to five P.M.; but on the other hand, neither do they, either expressly or impliedly at law or in equity, require the company to keep its office open until midnight in order to give him the opportunity to make the payment which he could just as well have made earlier in the day, or on some earlier day. There would be nothing in such a situation which would incline a court of equity to extend aid to either party.
Of course if the company did keep its offices open until midnight, obviously complainant could make a valid delivery there between five P.M. and midnight. So also if the only part of its offices which it so kept open was the room where deliveries of incoming mail were received. Obviously also it is merely a matter of difference in degree, not in principle, where the office which it keeps open for the receipt of incoming mail is its private box at the post office, instead of a room at its main offices, — or where it keeps such an office open by having a letter slot in one of its doors.
Defendant argues that such a delivery through a letter slot, with no one but a night watchman or janitor actually in the *Page 429 
offices, would not constitute a valid payment, but clearly logic does not support such an argument. The policy does not require the payment to be made to any particular person; nor at any particular place other than the place where the company's "Home" offices are, at the time, maintained. The company has just as much right to provide by letter slot, a means or method for deliveries at its main office at night, as it would to keep all of its offices open all night or up to midnight. That the purpose and intent of providing such a letter slot are to enable such deliveries to be made when the offices are otherwise closed, goes without saying.
So also with the private post box. The company for its own purposes and convenience, established that box for the delivery to it therein of the incoming mail addressed to it at its home office. Such mail so placed therein by the postal officials is thereby delivered to the company. The transportation from that box to some room in the company's office building is by the company, — by means of its own messenger and agent, and is no different in nature or effect than a transportation from one room in its office building to another.
If the company had not maintained such a private letter box, the letter would have remained in the hands of complainant, — complainant's agent, — until it was delivered by the letter carrier into the company's office in its office building. Under the facts in the present case, that would not have taken place until the morning of April 1st; — and the payment would not have been made within time; and there would be no equitable circumstances to lead this court to say that it should be deemed to have been made within time. But since the company, by its own act, — albeit an act which (we assume) it was under no duty to have done, — enabled complainant to effectuate an actual delivery within the prescribed time, there are no equitable circumstances to lead this court to say that it should be deemed not to have been made in time.
The defense set up in and by the separate answer in lieu of plea, is that the complainant herein, prior to the filing of the *Page 430 
present bill, instituted a suit at law against the defendant, wherein he set up the same repudiation by defendant of the policy in question as set forth in the present bill, and in one count demanded the return of all premiums paid ($828), and in a second count demanded damages of $2,500 as compensation for the loss and injury caused to him by such "breach of contract," to wit, "the value of said contract or policy;" that notwithstanding the suit at law was still pending, nevertheless by the institution of the suit at law, complainant had "repudiated his contract" and "made an irrevocable election" and that as the result of such election he is now not entitled to maintain the present suit in equity; or that in any event he should now be compelled to elect between the two suits and that the present suit should be dismissed or at least stayed, unless or until complainant discontinues his action at law.
The mere fact that complainant has brought a previous, uncompleted suit at law, — irrespective of the nature thereof, — does not deprive him of the right to seek to obtain relief in a subsequent suit in equity; nor vice versa. It is not the law that a plaintiff's choice of a forum in which to bring suit for redress or relief in respect to certain facts, is final and irrevocable. He may bring a suit in one state, discontinue it before completion, and bring a suit of the same essentialnature in another state or another court in the same state; (although he may be denied the right to maintain or prosecute two such suits at the same time, and be required to choose which he will pursue).
It is the law, however, that as respects an unjustifiable repudiation of contract, the wronged party has the right to choose whether he will terminate the contract and sue for compensation for the loss or damage occasioned to him by such wrongful repudiation or whether he will seek to compel the wrongdoer actually to perform the provisions of the contract notwithstanding the repudiation. Where one party wrongfully repudiates a contract, — says that he will no longer perform or be bound by its terms, — the contract is of course not thereby terminated. He has no right to, and cannot, *Page 431 
terminate the contract; the wronged party may refuse to consider the contract terminated and may sue to compel the wrongdoer to perform its terms. On the other hand, upon such wrongful repudiation there thereby accrues to the wronged party the right, if he so chooses, to terminate the contract, — to say that the contract has become terminated by the defendant's wrongful act, — and to sue for damages therefor.
Obviously the contract cannot, at one and the same time, be both in force and not in force. The wronged party has the right
to choose which it shall be, but he also has the correspondingduty of making such choice, one way or the other. Equally obviously he must make that choice or election, at the latest, prior to obtaining judgment or decree in any suit brought by him in respect of such contract. He cannot get both judgment or decree compelling performance of the contract as being still in force, and damages for the wrongful breach and termination of the contract or the return of the consideration paid by him in exchange for defendant's assumption of the obligation to perform the contract.
It is further the law that that choice or election, once made or evidenced by some overt act, is final and irrevocable, (when made with full knowledge of the facts and in the absence of any overriding equity), — at least if it be an election that the contract shall be deemed terminated. Where the wronged party has elected to terminate the contract, he cannot subsequently maintain a suit for the specific performance thereof. BlumBuilding Co. v. Ingersoll, 99 N.J. Eq. 563, at 568,134 Atl. Rep. 176; affirmed, [*]101 N.J. Eq. 291, 137 Atl. Rep. 916; Claron v.Thommessen, [*]96 N.J. Eq. 650, 126 Atl. Rep. 308; Maturi v.Fay, [*]98 N.J. Eq. 377, 129 Atl. Rep. 185; Rose v. Buckley, [*]98 N.J. Eq. 685, 130 Atl. Rep. 527.
Perhaps it should here be said that it is doubtful that the rule as to irrevocability can be said to apply to the converse situation, i.e., that where the wronged party has chosen that the contract shall not be terminated, he cannot thereafter maintain suit for damages. At any rate, if there be such a *Page 432 
rule, there are a great many exceptions to it. If the wronged party commence suit for specific performance and is unable to obtain decree for specific performance, the court of equity may in that suit, (at least in some instances), award him damages, —Ludlum v. Buckingham, 35 N.J. Eq. 71; S.C. on appeal, [*]39 N.J. Eq. 563; Fike v. Fike, 3 N.J. Mis. R. 485,128 Atl. Rep. 849; affirmed, [*]99 N.J. Eq. 424, 132 Atl. Rep. 922; Borden v.Curtis, 48 N.J. Eq. 120, 21 Atl. Rep. 472; or he may, after dismissal of his bill, thereafter maintain suit at law for damages, (at least if the dismissal be made without prejudice) —Knickerbocker Hotel and Realty Co. v. Clabby, [*]94 N.J. Eq. 173,118 Atl. Rep. 833.
The choice or election referred to is not necessarily made by the bringing of a suit. It may be made by matter in pais, prior to the bringing of any suit, — as by statements or letters from the injured party to the wrongdoer. B. Holding Company, Inc., v. Dubois, 100 N.J. Eq. 424, 136 Atl. Rep. 518, involved an instance of this kind. See also Storch v. Tepperman, 99 N.J. Eq. 48,131 Atl. Rep. 626; and Blum Building Co. v.Ingersoll, supra.
If not made prior to suit, the election is usually made in and by the bringing of a suit, — as the logical consequence of the nature of the relief claimed in such suit. Blum BuildingCo. v. Ingersoll, supra; Claron v. Thommessen, supra; Maturi
v. Fay, supra; Rose v. Buckley, supra.
In more or less exceptional cases, the bringing of a suit may not constitute or evidence an election, — as for instance where the complaint is so irregularly framed and worded as to make it impossible to determine just what the plaintiff does seek thereby; or where the complaint seeks both kinds of relief, without specifying any preference or "first choice."
In the instant case the defendant says that an election was made by complainant in and by the bringing of the prior suit at law, and that such election was, in effect, a disaffirmance of the continued existence of the contract and therefore precludes the present suit which is in the nature of a suit for specific performance. It is necessary therefore to examine the complaint in the prior suit. *Page 433 
That complaint contains two counts. Both allege defendant's wrongful repudiation of the policy. The first seeks the return of the premiums paid; the second seeks damages of a different kind.
Since the first count demands the return of the premiums paid, it obviously evinces an intent by plaintiff to consider that the contract has been terminated. He could not consistently expect to get back the consideration he paid and at the same time or thereafter, obtain performance of the contractual obligations assumed by defendant in exchange for the receipt of that consideration. That count, standing alone, would evidence and constitute an election in disaffirmance of the contract, — (at any rate if no final and irrevocable contrary election had previously been made). [*]Claron v. Thommassen, supra; [*]Maturi
v. Fay, supra; [*]Rose v. Buckley, supra.
Examination of the other count must also be made, however, — since it is the complaint as a whole which is alleged to constitute an election in disaffirmance of the contract; and if the second count evidences an intent in affirmance of the contract, the complaint as a whole would have no effect one way or the other in this regard, — especially since it indicates no preferential choice for the remedy sought by the first count over that sought by the second count, and both counts were filed at one and the same time.
If the two counts are inconsistent and cannot both be maintained at the same time, plaintiff doubtless would have to make a choice or election at some stage of the suit, but apparently this might not occur until at or after trial and verdict. See Rev. Stat. 2:27-37 and 227 (formerly Practiceact, P.L. 1912, c. 231, p. 377, §§ 11, 19), also Supreme CourtRules 16-23. In any event it does not appear on the present hearing in this court that any election or choice between the two counts has yet been made by plaintiff (complainant).
As has been said, the second count seeks damages for defendant's repudiation or breach in limine. That fact alone however is not determinative. In the ordinary suit at law, (except one under the Declaratory Judgments act), the only thing that can be asked or recovered is damages. The determinative *Page 434 
factor is the kind and amount of damages asked, — the theory or basis upon which they are asked. In the case of a suit at law by a vendor under a contract for the sale and purchase of land, where the defendant vendee's breach was his refusal to accept deed and pay the unpaid balance of purchase price and the plaintiff's claim for damages was in substance and effect a claim for the amount of such unpaid balance, such a suit is obviously, in substance and intent, an effort to compel performance of the contract. It does not evidence nor constitute an intent or election to disaffirm the continued existence of the contract; and (if not prosecuted to judgment) would not preclude a subsequent suit in equity for specific performance. This was so held by Vice-Chancellor Leaming in Van Buren v. Fine, 101 N.J. Eq. 373,139 Atl. Rep. 486; affirmed, [*]103 N.J. Eq. 327,143 Atl. Rep. 921.
In the instant case the suit at law was not of that kind. It is essentially analogous to a suit by a vendee against a vendor
for damages, because of the latter's refusal to perform. In theVan Buren opinion, (p. 377), Vice-Chancellor Leaming states that the preponderance of authority (there being apparently no determination in this state) seems to be to the effect that such an action is based "upon the contract" and is in affirmance of the contract and hence is not such a repudiation of the vendee's obligations under the contract as, without more, to preclude (if not prosecuted to judgment) a subsequent suit for specific performance. There is however neither any determination nor even any dictum to that effect, either in his opinion or that of the appellate court, — nor in any other reported case in this state which has come to the attention of this court.
It would seem that in such a holding there is necessarily involved a confusion of thought as between an action "based upon the contract" and an action "based upon the continued existence of the contract in full force and effect in futuro." Practically all suits in respect of a contract, except suits for rescission, cancellation or reformation, are "based upon" the contract. They are all suits to enforce rights arising out of the terms and provisions of the contract, — either to enforce *Page 435 
those terms or some of them, or to obtain redress for the breach of some or all of them. From a consideration of the New Jersey cases hereinbefore cited, however, it seems clear that the test (in respect of the question now being considered) is not as between suits "based on the contract," — (based on the theory that the contract in all its terms has always been valid and enforceable), — on the one hand, and suits for rescission, cancellation or reformation, on the other hand; the test is whether or not a complainant in equity or plaintiff at law, seeking in substance to compel the defendant to perform the terms of the contract, has by the prior suit evidenced that he has exercised the right which accrued to him by defendant's wrongful repudiation, namely, the right to put an end to the continued existence of the obligation of the parties further to perform the provisions of that contract (retaining and maintaining, however, the right to sue defendant for the damage sustained by defendant's wrongful repudiation and refusal to perform).
Judged by this test, it logically results that if the vendor's suit at law in the Van Buren Case had been a claim for damages representing simply the loss of the profit which vendor would have made on the sale, it would have evidenced his intent to retain the property and hence an intent that the contract should be deemed terminated as a continuing obligation; and he would thereby have lost the right to sue for specific performance. So also in the case of a suit at law by a vendee under a contract of sale, — if his claim therein is for damages measured by the difference between the contract price and the value of the premises, he thereby evidences that he has determined that the contract shall be deemed terminated as a continuing obligation, and he could not thereafter maintain suit for specific performance.
The same thing would be true in the instant case. If the claim for damages which plaintiff made in the second count of his suit at law shows that the particular damages so sought are such that by necessary or logical implication it is evidenced that plaintiff has chosen and determined that the contract shall be deemed no longer a continuing obligation, it will *Page 436 
result that he cannot maintain the present suit for specific performance of the contract.
By that count plaintiff sets up the policy of insurance; states that he has fully performed everything required to entitle him to full performance by defendant; further states that defendant has repudiated it, — i.e., notified plaintiff that it considered the policy as being no longer in force and that it would no longer protect or indemnify him (as it would be required to do if the policy still continued in force); and then states that he has been "damaged by such breach to the extent of the loss of the value of said contract," to wit, $2,500, which he seeks to recover as damages. What does this mean?
It may safely be said that by "breach" is meant the repudiation which is earlier stated therein. No other "breach" is alleged; and the repudiation is what is frequently termed an "anticipatory breach." The policy contract of course provides that defendant will pay certain sums to plaintiff if and when he suffers certain physical injuries. If plaintiff had suffered such a physical injury and defendant had refused to pay him the corresponding sum, and plaintiff was endeavoring by this count of the complaint to obtain the payment of that sum, it seems clear that the suit would then be substantially like the suit in the Van Buren Case,supra, — substantially a suit to compel performance, and hence not a disaffirmance of the contract as a continuing obligation.
That however is not the situation presented here. Plaintiff does not here seek recovery of any amount which he claims has become due to him under and in conformity with the terms of the contract. He says he has been damaged by defendant's wrongful repudiation of the contract, "to the extent of the loss of the value of said contract in the amount of $2,500" and therefore asks judgment for that amount.
He claims that by and because of defendant's repudiation, he has suffered the "loss of the value of the contract;" that that value was $2,500. He demands judgment for $2,500 as being the value of the contract which he has lost by defendant's repudiation. When he says that he has lost the "value of the contract," he can mean nothing else than that he has lost *Page 437 
the value of the defendant's performance of the obligations imposed upon it by the contract. The only way in which he can have lost the value of such performance is by having lost the right to insist upon such performance; and the only way in which he can have lost the right to insist upon such performance, — (he alleging that defendant's repudiation was wrongful), — is by a choice or determination on his own part that the contract shall be deemed no longer a continuing obligation. This second count, therefore, equally as well as the first, evidences and constitutes an act of election terminating the obligation of the parties thereto as to the future performance of the terms and provisions thereof.
Complainant however further contends that in order for defendant successfully to interpose the defense of prior election, he must establish, — and must set forth in his pleading, — that there was in fact actually available to complainant the remedy which he elected to endeavor to pursue; that defendant's answer in lieu of plea does not do this; and that in fact there is not open to complainant any such right of action such as he has attempted to pursue in his suit at law.
Whether or not, as a matter of strict pleading, it is requisite that the answer in lieu of plea should contain an averment that the remedy sought by plaintiff at law was legally available to him, need not here be decided. The parties have gone into the argument on the merits, and defendant may have leave to amend by adding such averment. For present purposes such amendment will be deemed to have been made.
In the first place it may well be doubted that it is of any materiality (so far as concerns the determination of the question of complainant's right to sue for specific performance), whether or not plaintiff's complaint at law sets forth (in either count) a maintainable cause of action; — whether or not it is legally open to plaintiff, on such a wrongful repudiation of contractual liability as is therein set forth, to sue forthwith for the return of premiums or for the damages caused by the anticipatory breach. Since it appears, (as has been set forth earlier herein), that the election to affirm or disaffirm the continued future existence of the obligation of *Page 438 
the provisions of the contract, — the determination as to whether the contract shall be deemed to continue in full force and effect or be deemed to have been terminated, — may be effectively and conclusively made prior to the commencement of any suit, is it not apparent therefrom that the question of whether or not plaintiff has open to him any particular means of judicial redress is of no materiality with respect to the question as to whether or not such an election has been made. True it may be that plaintiff's belief that certain means of judicial redress were open to him may have been an important factor in his election to "disaffirm the contract," but can the fact that he is mistaken in that belief (unless that belief was wrongfully induced by defendant) alter or be ground for setting aside his election to "disaffirm"? — especially since he is presumed to know the law. It is also obviously quite possible that at the time he makes that election, he may be quite willing to acquiesce in defendant's repudiation of the contract and have no intent of proceeding against him in any wise for redress. Under such considerations it might well be deemed that the only material question with regard to the proceedings commenced at law is as to the intent thereby evidenced. If it be evident from such proceeding that plaintiff must have determined and elected to "disaffirm" the contract, it is none the less proof of that choice and election, whether or not plaintiff can successfully maintain the proceeding so commenced.
However, it is not necessary to decide this question, because consideration of the causes of action set up in the suit at law shows that they are legally cognizable and maintainable.
As to the first count, it is suggested that in view of the provisions of the policy, (set forth and attached to the complaint) it is apparent that plaintiff has had the benefit of the protection under that policy for the full time covered by the premiums which he has paid, and that hence he does not have, and does not show, any right to the return of the premiums paid. It is doubtless true that he would not have the right to the return of the full amount of premiums paid; he has had the benefit of the protection, — has received *Page 439 
part (and a substantial part) of the consideration in exchange for the premiums he paid; but on the other hand, under the terms of the policy, he was entitled, in exchange for each annual premium, not only to protection for that year but also to the right to have that policy renewed from year to year on payment of similar premiums. That right constituted some part of the consideration for the premiums he paid; that part of the consideration due him has not been received by him but has been withheld from him by defendant; and in legal contemplation there appears no reason why he is not entitled to have a jury assess and award to him that which they may reasonably find to be the amount or value of that part of the premiums paid by him which represents such failure of consideration. In any event, redress is assuredly available to him under the second count.
As to the second count, it is suggested (and such seems to have been the position taken by defendant in the law action), that a repudiation or anticipatory breach gives, of itself alone, no right of action at law for the recovery of damages, — that no such right accrues until an actual breach (as distinguished from a preliminary repudiation), has occurred. This seems to be the law in New York. Kelly v. Security Mutual Life Insurance Co.,186 N.Y. 16, 78 N.E. Rep. 584; Killian v. Metropolitan LifeInsurance Co., 251 N.Y. 44. It is not however the law in this state. That doctrine was expressly repudiated by the supreme court in O'Neill v. Supreme Council, American Legion of Honor,70 N.J. Law 410, at 419, 57 Atl. Rep. 463; and the latter determination was expressly approved and adopted by the appellate court in Holt v. United Security Life Insurance and Trust Co., [*]74 N.J. Law 795, 67 Atl. Rep. 118.
It results that the motion to strike the answer in lieu of plea must be denied.
This may or may not be efficacious in completely disposing of the present suit. Under the language of the authorities cited and discussed herein, it appears (as has been said) that an election of affirmance or disaffirmance once made is final and conclusive; and also that such an election may be made *Page 440 
either by the bringing of a suit or by prior statements, oral or written. The answer in lieu of plea alleges that the bringing of the suit at law constituted an election by complainant in "disaffirmance" of the contract. Inferentially, at least, it also alleges that it was the first and hence the controlling election in that regard; and this latter allegation is taken as true on this motion. It is possible that the complainant herein may have made and evidenced an election in "affirmance" of the contract, (either by some such statement, or even possibly by the commencement of some other suit), prior to the commencement of the suit at law set up in the answer by way of plea. If so, it would seem from the authorities that such election should be final and conclusive, and that hence complainant would not be precluded from maintaining the present suit, — and that complainant will desire to raise this issue by filing replication to the answer in lieu of plea. Notwithstanding the desire of the court and of both parties to have the disposition of this motion effectuate a complete disposition of the case, it has not seemed wise to attempt any discussion, or statement of the probable outcome, of the raising of such issue, without the benefit of argument and citation of authorities in regard thereto.
Neither does it seem necessary or advisable under the present circumstances, to make any order requiring complainant to choose between the prosecution of the suit at law and this suit, and to stay or restrain the prosecution of the other. Complainant has made no attempt, and given no indication of any intent, to proceed further in the suit at law prior to the disposition of this suit. If this situation changes, further application may be made.
For the reasons stated the main answer will be held insufficient; the motion to strike the answer in lieu of plea will be denied.
By the stipulation of the parties, and the admission on the argument, it is evident that the word "denies," in each of paragraphs 5, 6 and 9 of the main answer should be amended to read "admits." Order for such amendment will be made. *Page 441 
Paragraph 2 of the main answer denies the allegation of the bill that "a true copy of the policy is annexed to the bill." This is improper pleading. Undoubtedly defendant does not mean that the copy is not for the most part correct. If there is any particular in which there is an error or omission in the copy, such particulars should be set forth. So also, paragraph 12 of the main answer simply denies the allegation of the bill that "complainant is now and always has been ready, willing and capable of performing all of the obligations required to be performed by him under said policy." There should be no blanket denial; the answer should specify any particular or particulars in which complainant has not been ready and willing to perform. See Chancery Rules 54, 57, 58, 67, 45 and 46.
The purpose and function of pleadings is to set forth anddefine the issues between the parties, — narrowing them so that it will appear just exactly what is in dispute. Blanket denials do not accomplish this; and they occasion the courts, — and indeed the parties also, — more trouble and waste of time than any other violation of the rules of pleading.
These two paragraphs of the main answer will be stricken on the court's own motion. Defendant may have leave to substitute proper particular denials, by amendment, if such be deemed material and important. *Page 442