******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

LANDMARK INVESTMENT GROUP, LLC *v.* CALCO
CONSTRUCTION AND DEVELOPMENT
COMPANY ET AL.
(SC 19287)

Rogers, C. J., and Palmer, Zarella, Eveleigh and McDonald, Js.

*Argued March 17—officially released September 29, 2015*

*Kerry M. Wisser*, for the appellant (plaintiff).

*Walter A. Twachtman, Jr.*, for the appellees (named
defendant et al.).

*Opinion*

McDONALD, J. The dispute in the present case has a long and circuitous history, which began more than one decade ago when the plaintiff, Landmark Investment Group, LLC (Landmark), a commercial real estate developer, entered into a contract to purchase an environmentally contaminated property in the town of Plainville (town) with the hopes of remediating and developing it for commercial use. The seller of the property, Chung Family Realty Partnership, LLC (Chung, LLC), repudiated the contract for sale after receiving a more attractive offer from the defendants, CALCO Construction & Development Company (Calco) and John Senese, Calco's president and owner.[1] After the defendants funded Chung, LLC's unsuccessful defense of Landmark's action for specific performance of the contract, Landmark was nevertheless unable to purchase the property after it was sold at a foreclosure auction where a company controlled by Senese was the highest bidder. Landmark then brought the present action against the defendants, alleging tortious interference with its contractual relations and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. After the jury returned a verdict in favor of Landmark on both counts, the trial court granted the defendants' motion for judgment notwithstanding the verdict and rendered judgment for the defendants. Landmark now appeals from the judgment of the trial court,[2] claiming, inter alia, that the trial court improperly granted the defendants' motion because it failed to view the evidence in the light most favorable to sustaining the jury's verdict, and that the trial court incorrectly concluded that Landmark presented insufficient evidence to support its claims. We agree and, accordingly, reverse the judgment of the trial court and remand the case for further proceedings.

The jury reasonably could have found the following facts. In January, 2005, Landmark first entered into a contract to purchase a nine acre parcel of land known as 311–349 New Britain Avenue in Plainville (property) with Chung, LLC. The property required environmental remediation and at that time contained only dilapidated buildings. Chung, LLC, which had encumbered the property with two purchase money mortgages when it purchased the property several years earlier, listed it for sale after being unable to complete the development. Although Landmark was aware that the property required remediation, Landmark learned, shortly after entering into the contract, that the estimated cost of remediation was significantly higher than anticipated—approximately $1.3 million. Landmark and Chung, LLC, then supplanted the January contract with a new contract on June 30, 2005, which provided Landmark with greater protections regarding the remediation and development plans for the property (Landmark-

Chung contract).

The Landmark-Chung contract contained a number of contingencies to account for the uncertainties surrounding the environmental remediation of the property. Notably, the contract required Chung, LLC, within twenty days of the execution of the agreement, to develop a remediation action plan at its expense and file it with the state Department of Environmental Protection (department),[3] whose approval of such a plan is necessary before cleanup can begin on a contaminated property. The Landmark-Chung contract further provided that, once a remediation action plan was approved, Landmark, with the participation of the town, was to file an application with the Connecticut Brownfields Redevelopment Authority (authority) which would, if such application was approved, provide funding to assist with the cost of remediating the property. In the absence of such funding, however, the cost of remediation was to fall on Chung, LLC; the contract required that Chung, LLC, place the entire net proceeds from the sale of the property, minus certain deductions, in escrow pending the completion of the remediation. The escrow funds were to be used to offset any shortfall between the funding provided by the authority and the total cost of remediation.

The Landmark-Chung contract also contained certain contingencies to ensure that Landmark would be able to develop the property for commercial use. Notably, within ninety days of the receipt of the funding from the authority, Landmark was to apply for certain regulatory approvals, including, inter alia, building permits, wetlands approvals, and traffic approvals, and, in the event any such approval was not obtained to Landmark's satisfaction, Landmark maintained the right to terminate the Landmark-Chung contract. Landmark also was to apply for a loan from a financial institution to be secured by a first mortgage on the property. While all of these conditions were being performed and until closing occurred, the Landmark-Chung contract required that Chung, LLC, keep current all municipal taxes.

Shortly after entering into the contract, however, relations between Chung, LLC, and Landmark began to unravel. Two months after the Landmark-Chung contract was executed, Chung, LLC, was seeking "a way out" of the deal. Moreover, in spite of Chung, LLC's agreement to prepare the remediation action plan within twenty days, months passed without its compliance with this contractual obligation. Despite the significant delay, Landmark nevertheless undertook efforts to market the property and to develop alternative site plans for development.

Meanwhile, unbeknownst to Landmark, in December, 2005, Senese met with Chung, LLC's real estate broker to discuss the property and began negotiations regarding Calco's plan to purchase and develop it. Chung,

LLC's broker informed Senese that the property was under contract, but nevertheless drafted a letter of intent on Calco's behalf to serve as a backup offer for the purchase of the property, which Senese submitted in January, 2006. This letter of intent contained terms similar to the Landmark-Chung contract,[4] a copy of which Chung, LLC's managing member, Henry Chung, agreed to share with Senese. Although Chung, LLC, never acted on this letter of intent, the defendants remained interested in the property.

It was not until August, 2006, that Landmark received notice that the department had approved a remediation action plan, which estimated that the cost of remediation would be only $265,000. Because this estimated cost was significantly lower than originally anticipated, the town indicated that it would not participate in the application to the authority, which decision was fatal to Landmark's application for funding. Because the authority funding was unavailable, Chung, LLC, took the position that the Landmark-Chung contract was void and would need to be renegotiated. Landmark, however, contended that the contract could continue to be performed according to its terms. Landmark and Chung, LLC, met in early September, 2006, to discuss their disagreement as to the continued validity of the Landmark-Chung contract, but were unable to reach a resolution.

While relations between Chung, LLC, and Landmark continued to unravel, Chung, LLC, and Calco continued to discuss the potential sale of the property. Calco submitted a second letter of intent on September 21, 2006, containing a lower purchase price, but with many other attractive terms, including a $250,000 nonrefundable deposit, and, most importantly, an "as is" provision that promised a closing within thirty days. Thus, under the terms of Calco's second letter of intent, Chung, LLC, would have no responsibility for the cost to remediate the property, which was a great benefit to Chung, who was insolvent. Although Chung, LLC, did not immediately act on Calco's second letter of intent, a few weeks after receipt of the offer, Chung met with Senese and was eager to discuss the possibility of a contract with Calco. At that meeting, Senese assured Chung that Calco was willing and able to purchase the property in accordance with the terms of the second letter of intent, and promised that Calco would close on the property quickly.

On October 27, 2006, approximately two months after Landmark learned that the town would not participate in the application to the authority, Chung, LLC, sent a letter to Landmark purporting to terminate their contract for the sale of the property. The letter provided, inter alia, that the Landmark-Chung contract was predicated upon receipt of funding from the authority and that, because the town would not join the application,

the contract was "incapable of being performed." In light of Chung, LLC's repudiation of the contract, Landmark's ability to move forward with the steps necessary to develop the property was hindered because the regulatory approvals required Chung, LLC's cooperation. Shortly after the repudiation, however, Landmark filed an action against Chung, LLC, seeking specific performance of the Landmark-Chung contract, and recorded the contract and a lis pendens on the town land records.

While Landmark's specific performance action was pending, in March, 2007, Calco and Chung, LLC, finally entered into a formal contract for Calco to purchase the property. That contract acknowledged the existence of Landmark's legal action and provided that the closing would occur within fifteen days of a resolution of that action in favor of Chung, LLC, and a release of the lis pendens from the land records. Calco's obligation to purchase the property was contingent, however, on Calco purchasing and receiving assignments of the first and second mortgages that encumbered the property, which were then in default and at risk of foreclosure with Chung, LLC, owing more than $240,000. Pursuant to the contract, Calco was to receive from Chung, LLC, interest only payments on the mortgages and agreed that it would not declare them in default and would not initiate foreclosure, but only "*so long as* [*Calco's purchase and sale agreement*] *remain*[*ed*] *in force or effect* . . . ." (Emphasis added.)

On the same day that Calco and Chung, LLC, executed their purchase and sale agreement, they also executed multiple side agreements, which included agreements that (1) Calco would loan Chung, LLC, funds to defend Landmark's action for specific performance, which Chung alone was unable to afford, (2) Calco would loan Chung, LLC, funds for payment of municipal property taxes then due or as they accrued, on which Chung, LLC, had already fallen behind by nearly $14,000, and (3) Chung, LLC, was indebted to Calco for the cost of "legal fees for representation in these matters, which . . . include negotiations incident to the [purchase and sale] [a]greement between them, and resolution of various related issues" (collectively, Calco-Chung contracts). Calco's agreements to provide these loans were secured by a mortgage on the property, as well as an assignment of a mortgage owned by Chung on another property located in Manchester, which was his only source of income. Under the terms of the Calco-Chung contracts, the total amount of each of those loans would become due ninety days after Calco's purchase and sale agreement ceased to be in effect. Although the Calco purchase and sale agreement was a "backup offer" in the sense that it recognized the priority of the Landmark-Chung contract and the action for specific performance, Senese acknowledged that the Calco-Chung contracts were unlike any other backup offer he had submitted or encountered in his twenty-five years of

experience as a real estate developer.

Despite Chung, LLC's efforts to defeat Landmark's action for specific performance, and, after borrowing more than $200,000 from Calco to fund that defense, Landmark ultimately prevailed. In 2009, the trial court, *Dunnel, J.*, concluded that the repudiation of the Landmark-Chung contract was an unjustified breach of that contract, and the court rendered a judgment of specific performance, which was affirmed by the Appellate Court on December 28, 2010. *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 708, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011). While the action was pending, however, Chung, LLC, failed to keep the taxes on the property current, notwithstanding the agreement that Calco would loan it funds to do so. Because of this failure, the town initiated a foreclosure action on the property, and, after the entry of a judgment of foreclosure, the property was set to be sold at auction on January 22, 2011.

After the Appellate Court affirmed the judgment of specific performance, Landmark, knowing that the date of the foreclosure sale was approaching, offered to purchase the tax liens on the property in an effort to forestall the sale so as to enable Landmark and Chung, LLC, to perform under the terms of the Landmark-Chung contract. Landmark and the town reached an agreement whereby the town consented to having the foreclosure judgment opened and the sale date extended, in light of Landmark's representation that it would purchase the full amount of the tax liens. On the date of the hearing on the motion to open the judgment and extend the sale, however, Calco's attorney entered an appearance to oppose the motion, arguing that Calco had a right to have the foreclosure sale proceed because its mortgages on the property were in "serious default . . . ." The court, *Hon. Lois B. Tanzer*, judge trial referee, nevertheless agreed to open the judgment and extend the date of the foreclosure sale, moving the auction date to March 19, 2011. *Plainville* v. *Chung Family Realty Partnership, LLC*, Superior Court, judicial district of New Britain, Docket No. CV-10-6004745-S (January 18, 2011).

The same day that the court granted the motion to extend the foreclosure sale, Calco sent a letter to the town also offering to purchase the tax liens. Faced with competing offers, the town refused to sell the liens to either Landmark or Calco and chose instead to allow the foreclosure sale to proceed. Although Chung, LLC, urged Landmark to buy the property immediately at a lower purchase price, rather than pursue the conditions under the contract, Landmark declined to do so, contending that the judgment of specific performance entitled Landmark to pursue the required regulatory approvals and to seek a bank loan before it was obli-

gated to purchase the property. As a final effort to salvage its ability to pursue those conditions, Landmark offered to loan Chung, LLC, the amount it owed in taxes, but, in exchange for such a loan, Landmark requested that it be granted a first mortgage on the property, which would have required Calco to subordinate the mortgages that it had purchased as part of the Calco-Chung contracts. Calco, however, refused to do so. Without the ability to reach an agreement regarding the payment of the taxes, the foreclosure sale went forward, at which a company controlled by Senese was the successful bidder for the property. The trial court thereafter approved the sale and committee deed. *Plainville* v. *Chung Family Realty Partnership, LLC*, Superior Court, judicial district of New Britain, Docket No. CV-10-6004745-S (April 6, 2011).

The record also reveals the following procedural history. Landmark brought this action against the defendants alleging in its fourth amended complaint that they tortiously interfered with Landmark's contractual relations and that such interference constituted "unfair competition or unfair deceptive acts or practices, or both," in violation of CUTPA. See General Statutes § 42-110b (a). Prior to trial, Landmark applied for a prejudgment remedy pursuant to General Statutes § 52-278a et seq., to attach real and personal property owned by the defendants, which the trial court, *Swienton, J.*, denied. In its memorandum of decision, the court found that the defendants' actions were "nothing more than aggressive business practices" and, therefore, found that the conduct of the defendants could not constitute tortious interference or violations of CUTPA. The court's denial of a prejudgment remedy was affirmed by the Appellate Court. *Landmark Investment Group, LLC* v. *Calco Construction & Development Co.*, 141 Conn. App. 40, 55, 60 A.3d 983 (2013).

The case was later tried to a jury, and, at the close of Landmark's case-in-chief, the defendants filed a motion for a directed verdict, on which the trial court reserved judgment. The jury later returned a verdict in favor of Landmark on both counts alleging tortious interference and violation of CUTPA. The jury awarded Landmark damages in the amount of $4 million, and, finding that both defendants had acted with reckless indifference to Landmark's rights, concluded that Landmark should also be awarded common-law punitive damages.[5] After the court accepted the jury's verdict, the defendants filed a motion for judgment notwithstanding the verdict, in which they argued, inter alia, that there was insufficient evidence to prove that either Calco or Senese tortiously interfered with the Landmark-Chung contract or that they violated CUTPA.

In granting the defendants' motion, the trial court issued a lengthy memorandum of decision outlining the court's conclusion that Landmark failed to present

sufficient evidence from which the jury could find that Landmark proved either of its two claims. The court began by adopting anew the facts that it had found when it denied Landmark's application for a prejudgment remedy. With respect to Landmark's tortious interference claim, the trial court first concluded that, as a matter of law, the jury could not consider as evidence any of the defendants' conduct that occurred after October 27, 2006—the date that Chung, LLC, repudiated the Landmark-Chung contract—because, according to the trial court, once the contract was breached, the defendants could not have interfered with its performance. The court then held that no reasonable jury could have found in Landmark's favor on its tortious interference claim because, prior to that repudiation, the only conduct on which Landmark relied in support of its claim was Calco's submission of letters of intent as backup offers, which, the court maintained, were not tortious as a matter of law. The court went on to conclude, however, that even if it considered all of the evidence presented up until the property was sold at the foreclosure sale, Landmark still failed to prove its claim of tortious interference because the defendants' actions "were merely good business practices taken by Calco to protect its interest in the property." Moreover, the court held that Landmark failed to establish that it suffered "actual loss"—an essential element of its claim of tortious interference—as a result of the defendants' conduct because any loss was caused, not by the defendants' conduct, but rather by Landmark's failure to purchase the property after it won a judgment of specific performance. Finally, the court held that, even if it were to find that Landmark presented sufficient evidence of tortious interference, it failed to present any evidence from which the jury could conclude that the defendants acted with reckless indifference to Landmark's contractual rights because, as the court had previously concluded when it denied Landmark's application for a prejudgment remedy, "[the defendants'] action[s] were nothing more than aggressive business practices." (Internal quotation marks omitted.) Thus, the court held that Landmark could not recover punitive damages on its claim of tortious interference.

Next, with respect to Landmark's claim that the defendants' conduct violated CUTPA, the court concluded that no reasonable jury could have found that the defendants committed any unfair or deceptive practice prohibited by CUTPA, and, second, that even if the defendants' actions were unfair or deceptive, Landmark failed to prove that it suffered any "ascertainable loss" as a result of the defendants' conduct. Thus, the court rendered judgment for the defendants on both counts.

On appeal, Landmark challenges each of the trial court's conclusions and argues that the court improperly substituted its own factual findings for those that reasonably could have been found by the jury. Land-

mark further contends that it presented sufficient evidence from which the jury could find that the defendants tortiously interfered with the Landmark-Chung contract and did so with a reckless indifference to Landmark's rights, and that the defendants' conduct violated CUTPA. The defendants, however, argue that the court properly rendered judgment in their favor because the jury's verdict was not in accordance with the law or the evidence presented at trial. We note that the defendants did not argue before the trial court or this court that Landmark could not obtain a judgment for tortious interference based on its contract with Chung, LLC, after it was awarded specific performance. As Justice Zarella indicates in his concurring opinion, there is some authority that supports the proposition that, once a party to a contract is awarded specific performance, the contract merges into the decree of specific performance, and any further claims must be raised through an action to enforce that judgment, rather than an action based on the contract. Because this issue was not raised, however, we decline to consider it.

Before turning to the merits of these arguments, we begin by articulating the standard of review that governs our resolution of these claims. "We have stated that directed verdicts are disfavored because [l]itigants have a constitutional right to have factual issues resolved by the jury. . . . Accordingly, [o]ur review of a trial court's [decision] to direct a verdict or to render a judgment notwithstanding the verdict takes place within carefully defined parameters." (Citation omitted; internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 336, 994 A.2d 153 (2010). "[I]n reviewing the trial court's decision to render judgment notwithstanding the verdict, we may affirm that decision only if we find that the jury could not reasonably and legally have reached their conclusion. . . . The question is not whether we would have arrived at the same verdict, but whether, when viewed in the light most favorable to sustaining the verdict, the evidence supports the *jury's* determination." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 346–47; see also *Ulbrich* v. *Groth*, 310 Conn. 375, 414, 78 A.3d 76 (2013) (role of trial court on motion for judgment notwithstanding verdict "is not to sit as [an added] juror . . . but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did" [internal quotation marks omitted]). A trial court may only grant a motion for judgment notwithstanding the verdict if the "jury reasonably and legally could not have reached any other conclusion"; (internal quotation marks omitted) *Haynes* v. *Middletown*, 314 Conn. 303, 311–12, 101 A.3d 249 (2014); and must deny such a motion "where it is apparent that there was some evi-

dence upon which the jury might reasonably reach [its] conclusion . . . ." (Internal quotation marks omitted.) *Salaman* v. *Waterbury*, 246 Conn. 298, 304, 717 A.2d 161 (1998). We review a trial court's decision on a motion for judgment notwithstanding the verdict for abuse of discretion. *Grayson* v. *Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 178, 646 A.2d 195 (1994).

At the outset, we note that we agree with Landmark that the trial court's memorandum of decision indicates that the court failed to view the evidence in the light most favorable to sustaining the jury's verdict, the most stark indication of which was that, rather than marshaling the evidence from the trial most favorable to Landmark, the court relied on factual findings it made when it denied Landmark's application for a prejudgment remedy before the trial even took place. See *E. J. Hansen Elevator, Inc.* v. *Stoll*, 167 Conn. 623, 628–29, 356 A.2d 893 (1975) ("[t]he adjudication made by the court on the application for a prejudgment remedy is not part of the proceedings ultimately to decide the validity and merits of the plaintiff's cause of action"). We must nevertheless consider whether, even when viewing the evidence in the light most favorable to Landmark, the trial court's judgment could be affirmed on the ground that Landmark presented insufficient evidence to support its claims. We conclude, in applying the proper deference to the jury's verdict, that the trial court improperly granted the defendants' motion for judgment notwithstanding the verdict.

I

We begin with Landmark's claim that the trial court improperly rendered judgment in the defendants' favor on the count alleging tortious interference with Landmark's contractual relations. "A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 212–13, 757 A.2d 1059 (2000). In the present case, the parties only dispute the final two elements of Landmark's cause of action, namely, whether the defendants' conduct was in fact tortious and whether Landmark established that it suffered actual loss as a result of the defendants' conduct. We consider each of those two elements in turn.

A

With respect to the issue of whether the defendants' conduct was tortious, Landmark makes two arguments. First, Landmark contends that the trial court incorrectly held that the jury could only consider evidence that

predated the repudiation of the Landmark-Chung contract as supporting its claim of tortious interference.[6] Second, Landmark argues that, in considering the cumulative impact of the evidence, the jury reasonably could have found that the defendants' conduct was tortious because the evidence indicated that the defendants "were on a mission to acquire the property" and that their conduct amounted to "business assassination" rather than " 'merely good business practices . . . .' "

As a threshold matter, we first consider what conduct may properly be considered in support of Landmark's claim that the defendants acted tortiously. The trial court held that, as a matter of law, because the Landmark-Chung contract was breached on October 27, 2006, the contractual relations between Landmark and Chung, LLC, ended as of that date, and, therefore, the jury could only consider evidence of conduct preceding that date. This was so, the court opined, because "conduct after the breach . . . could not have *induced* Chung, LLC, to breach the contract." (Emphasis in original.) Landmark argues that this conclusion was incorrect because the Landmark-Chung contract remained in effect from the time it was entered in June, 2005, until the property was lost after confirmation of the foreclosure sale in April, 2011, and, therefore, the jury could properly consider as evidence all of the defendants' conduct occurring during that time period.[7] We agree with Landmark.

This court reviews de novo a trial court's conclusion on a matter of law. *Watts* v. *Chittenden*, 301 Conn. 575, 585, 22 A.3d 1214 (2011). To resolve this issue, we first note that it is not necessary for a plaintiff to prove that a contract was in fact breached in order to recover on a claim of tortious interference. See, e.g., *Herman* v. *Endriss*, 187 Conn. 374, 376–77, 446 A.2d 9 (1982). Moreover, the mere fact that a contract is breached does not necessarily mean that the contractual relationship between two parties has terminated. Indeed, a multitude of issues must be considered in determining whether contractual relations have ceased, including, for example, whether such a breach was material. See, e.g., *Revere Real Estate, Inc.* v. *Cerato*, 186 Conn. 74, 80, 438 A.2d 1202 (1982). As is relevant in this case, even a total repudiation of a contract may not terminate contractual relations when the nonbreaching party elects to insist on specific performance of the agreement, and specific performance is so ordered. If it were otherwise, a nonbreaching party could not successfully obtain an order of specific performance with respect to a contract that, legally, was fully "terminated" as opposed to one that was simply "breached." See *Levy* v. *Massachusetts Accident Co.*, 124 N.J. Eq. 420, 430–31, 2 A.2d 341 (1938) ("Where one party . . . says that he will no longer perform or be bound by [the] terms [of a contract], *the contract is of course not thereby terminated*. He has no right to, and cannot,

terminate the contract; *the wronged party may refuse to consider the contract terminated and may sue to compel the wrongdoer to perform its terms*." [Emphasis added.]).[8] Although in another case it may be proper to conclude that a plaintiff may not allege acts of tortious interference occurring after the date that a contract is breached, under the facts of this case, where Landmark sought and won specific performance of its contract, it is evident that Landmark's and Chung, LLC's contractual relationship endured until the property was sold at the conclusion of the foreclosure. Thus, all of the defendants' conduct occurring between June, 2005, when the Landmark-Chung contract was entered, and April, 2011, when the purchase of the property by Senese's company at the foreclosure sale was confirmed by the trial court, could properly be considered by the jury in determining whether Landmark presented sufficient evidence of tortious interference.[9] The trial court's conclusion to the contrary was improper.

In light of this conclusion, we next consider Landmark's argument that the defendants' conduct, when viewed as a whole, was sufficient to support the jury's finding that their conduct was indeed tortious. Landmark argues that the jury reasonably could have found that the defendants sought to exercise an economic "stranglehold" over Chung by loaning Chung, LLC, funds to defend Landmark's specific performance action and to pay municipal taxes, as well as promising not to foreclose on the mortgages on the property, but *only* so long as Calco's purchase and sale agreement was in effect. Furthermore, Landmark contends that the jury could infer through the totality of the defendants' conduct that they were acting maliciously and with the purpose to interfere with Landmark's contractual rights. The defendants, however, disagree that the jury could infer any improper motive on their part because none of their acts were individually wrongful. We agree with Landmark that the jury had before it sufficient evidence from which it could conclude that the defendants' conduct was tortious.

This court has held that, in an action for tortious interference, "not every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute [an action for tortious interference] it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously." (Citations omitted; internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 805, 734 A.2d 112 (1999); see also *Blake* v. *Levy*, 191 Conn. 257, 262, 464 A.2d 52 (1983) ("[a] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself" [internal quotation marks omitted]). "The plaintiff in a tortious

interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." (Internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.*, supra, 806. Whether a defendant's interference is tortious is a question of fact for the jury. Cf. *Suarez* v. *Dickmont Plastics Corp.*, 229 Conn. 99, 111, 639 A.2d 507 (1994) (intent to injure is "a question of fact that is ordinarily inferred from one's conduct or acts under the circumstances of the particular case"); *Batick* v. *Seymour*, 186 Conn. 632, 646–47, 443 A.2d 471 (1982) (questions of motive and intent are questions of fact for jury); see also 4 Restatement (Second), Torts, Interference with Contract § 767, comment (*l*), p. 39 (1979) ("the determination of whether . . . interference was improper . . . is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question").

In light of the facts before it, the jury reasonably could have concluded that, after enticing Chung, LLC, to repudiate its contract with Landmark by promising better contract terms,[10] the defendants sought to exploit Chung's financial hardship and to exert economic pressure over him and his company in an effort to ensure that Chung, LLC, would be forced to continue to pursue a contractual relationship with the defendants, in derogation of the contract that Chung, LLC, had with Landmark. See 4 Restatement (Second), supra, § 767, comment (c), p. 31 ("[e]conomic pressure . . . is a common means of inducing persons not to deal with another" and to determine whether such pressure is proper, fact finder can consider, inter alia, "the circumstances in which it is exerted . . . the degree of coercion involved, the extent of the harm that it threatens . . . and the general reasonableness and appropriateness of this pressure as a means of accomplishing the actor's objective"). By enabling and encouraging Chung, LLC, to fight the specific performance action by funding that litigation, the defendants ensured that the performance of the Landmark-Chung contract was more burdensome to perform. Furthermore, because the defendants agreed to forgo collection on the loans it had provided to Chung, LLC, and to forgo foreclosing on the property only so long as the Calco purchase and sale agreement was in effect, as Chung, LLC, was driven deeper into the defendants' debt, it was forced to strive to terminate the contractual relationship with Landmark so that the contract with the defendants could go forward. Otherwise, Chung, LLC, risked not only losing the property through the defendants' foreclosure on the defaulted mortgages, but Chung also risked losing his only source of income, which had been assigned to Calco as collateral in exchange for the agreement to loan litigation expenses and money for the payment of municipal taxes. The jury reasonably could have con-

cluded that this conduct constituted extreme economic pressure that went beyond the normal industry practice of competition between rival developers. See *Church of Scientology International* v. *Eli Lilly & Co.*, 848 F. Supp. 1018, 1029–30 (D.D.C. 1994) (question of whether defendant's economic pressure amounted to tortious interference was issue for jury). Tellingly, Senese conceded at trial that the Calco-Chung contracts were unusual and unlike any other backup offer he had extended in his career.

The jury also could have inferred that the defendants had an illicit motive when, for example, after Landmark won specific performance of the Landmark-Chung contract and there was no longer any question that Landmark had the right to purchase the property, the defendants took steps to prevent Landmark from extending the date of the foreclosure sale of the property, which otherwise would have enabled Landmark to perform under the terms of its contract. Notably, the defendants did not display any interest in purchasing the tax liens from the town until immediately after they became aware that Landmark had the opportunity to do so. Although, on its own, such conduct may not be wrongful, the jury was free to view this action as only one part of a continuing scheme aimed at preventing Landmark from successfully purchasing the property. *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 502 n.23, 656 A.2d 1009 (1995) (in tortious interference cases, "trier of fact ordinarily may infer . . . intent [and malice] from the defendant's conduct or acts in light of the circumstances of the particular case"). In sum, the jury reasonably could have found that the defendants' acts were part of a concerted effort to intentionally interfere with the Landmark-Chung contract, beyond any form of accepted business practice, so that Calco could purchase the property itself. Although the trial court may have disagreed with the jury's conclusion, it was within the province of the jury to make this determination.

We are not persuaded by the defendants' attempt to disassemble each of their acts from all of their others, and to characterize each of these disaggregated acts as individually innocuous. The jury was permitted to view the totality of the evidence and draw the inference that the defendants intended to interfere with Landmark's contractual relations and did so with malice. See, e.g., *American Diamond Exchange, Inc.* v. *Alpert*, 101 Conn. App. 83, 92–93, 920 A.2d 357, cert. denied, 284 Conn. 901, 931 A.2d 261 (2007). Thus, it was improper for the trial court to set aside the jury's verdict on this element of Landmark's tortious interference claim.

B

Having concluded that Landmark presented sufficient evidence from which the jury could find that the defendants' conduct was tortious, we next consider

whether Landmark presented sufficient evidence as to its claim of actual loss.

The record reveals the following additional facts with respect to this claim. At trial, Landmark presented the report and testimony of William E. Kane, Jr., who was qualified as an expert, in support of its claim that it suffered actual loss as a result of the defendants' tortious interference. Kane, a commercial real estate appraiser certified by the state of Connecticut and a designated member of the Appraisal Institute, used both a sales comparison approach and an income capitalization approach; see *United Technologies Corp.* v. *East Windsor,* 262 Conn. 11, 17 nn.9 and 10, 807 A.2d 955 (2002); to conduct analyses to determine the amount of profits Landmark lost when it was unable to develop the property according to its plans. After developing those analyses and taking into consideration the purchase price and costs of development, Kane determined that Landmark's lost profits were approximately $4.5 million. In reaching that conclusion, Kane made a series of assumptions, including ones relating to Landmark's ability to obtain the necessary municipal and state approvals and to secure mortgage financing. Notably, the defendants did not present their own expert to challenge Kane's assumptions or conclusions.

Despite this evidence, the trial court concluded that no reasonable jury could have found that the defendants caused Landmark any loss because Landmark did not prove that there was a reasonable probability that it would have purchased the property or would have been able to develop it. The court based this conclusion principally on two separate grounds: first, that Kane's assessment as to Landmark's lost profits was not credible; and second, that Landmark's failure to purchase the property after the judgment of specific performance was rendered was the actual cause of Landmark's loss, notably, because Landmark did not present evidence indicating that it was pursuing any of the conditions that it argued it had the right to be fulfilled prior to purchasing the property.[11]

Before this court, the defendants largely parrot the trial court's reasoning in arguing that Landmark failed to prove that it suffered actual loss. Landmark, however, disagrees with each of the trial court's reasons and contends, first, that Kane's testimony provided the jury with sufficient evidence of Landmark's lost profits, and second, that the trial court improperly concluded that Landmark was required to purchase the property immediately after the judgment of specific performance, rather than pursue the contingencies under the contract. We agree with Landmark.

It is well established that, in order for a plaintiff to recover for a claim of tortious interference, it must establish that, "as a result of the interference, the plaintiff suffered actual loss. . . . [P]roof that some damage

has been sustained is necessary to [support a cause of action for tortious interference]." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 33–34, 761 A.2d 1268 (2000); see also *Goldman* v. *Feinberg*, 130 Conn. 671, 675, 37 A.2d 355 (1944) ("it is essential to a cause of action for unlawful interference . . . that it appear that, *except for the tortious interference of the defendant*, there was a reasonable probability that the plaintiff would have . . . made a profit" [emphasis added]). "A major problem with damages of this sort, [however], is whether they can be proved with a reasonable degree of certainty. . . . If the question is whether the plaintiff would have succeeded in attaining a prospective business transaction in the absence of [the] defendant's interference, the court may, in determining whether the proof meets the requirement of reasonable certainty, give due weight to the fact that the question was made hypothetical by the very wrong of the defendant." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 34.

The evidence established, through Kane's report and testimony, that had Landmark been able to purchase and develop the property in accordance with its plans, it would have profited, and the jury reasonably could have found that the defendants' interference is what prevented Landmark from completing its purchase and expected development. Although Kane's evaluation was based on a series of assumptions, namely, that Landmark would receive the regulatory approvals necessary to develop the property, those assumptions were supported by evidence that Landmark would have indeed been able to obtain such approvals. See, e.g., *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 70, 717 A.2d 724 (1998) ("[a] damage theory may be based on assumptions so long as the assumptions are reasonable in light of the record evidence" [internal quotation marks omitted]). The defendants did not provide the jury with any evidence to controvert this point, nor did they present any evidence that such approvals would have contained conditions so objectionable that they would have led Landmark to choose to terminate the Landmark-Chung contract rather than to go forward with its plans for development.[12] Moreover, the defendants did not present their own expert to contest the reasonableness of Kane's lost profits evaluation. Whether Kane's testimony was credible in light of the evidence was a determination for the jury to make.[13] See, e.g., *Kervick* v. *Silver Hill Hospital*, 309 Conn. 688, 717, 72 A.3d 1044 (2013) ("[n]othing in our law is more elementary than that the trier is the final judge of the credibility of witnesses and of the weight to be accorded their testimony" [internal quotation marks omitted]).

With respect to the question of whether Landmark

caused its own loss by failing to purchase the property immediately after it won a judgment of specific performance, we note that the only opportunity Landmark had to purchase the property at that juncture was not in accordance with the terms of the Landmark-Chung contract, but rather required Landmark to purchase the property without the protections afforded to it in its contract. Although the trial court faulted Landmark for not seeking to fulfill the conditions of the contract because it did not submit applications for regulatory approvals or for a bank loan, the jury reasonably could have found that it was the defendants' conduct that *caused* Landmark to have reason to doubt that it was ever going to have the opportunity to purchase the property, and, therefore, to rightfully withhold performance of those conditions. See, e.g., *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 34 ("[i]f the question is whether the plaintiff would have succeeded in attaining a prospective business transaction in the absence of [the] defendant's interference, the court may . . . give due weight to the fact that the question was made hypothetical by the very wrong of the defendant" [internal quotation marks omitted]); *Romaniello* v. *Pensiero*, 21 Conn. App. 57, 61, 571 A.2d 145 (1990) ("[t]he law does not require a party to proceed with preparations for performance if such preparations would be futile"). Indeed, it would be nonsensical to require Landmark, as the injured party, to pursue these contingencies at its expense after Chung, LLC's repudiation of the contract, or, after the judgment of specific performance, in light of the uncertainty surrounding Landmark's ability to purchase the property while the foreclosure was proceeding to an auction. Cf. 2 Restatement (Second), Contracts § 257, comment (a), p. 296 (1981) ("[a]n injured party who continues to perform in spite of a repudiation may . . . be precluded . . . from claiming damages for loss that he could have avoided").

Moreover, to the extent that the trial court suggested that Landmark did not have the right to proceed under the precise terms of the Landmark-Chung contract after the trial court rendered a judgment of specific performance, we disagree. Landmark's insistence that it have the opportunity to perform pursuant to the terms of its contract is consistent with the law.[14] See, e.g., *Bleecher* v. *Conte*, 29 Cal. 3d 345, 353–55, 698 P.2d 1154, 213 Cal. Rptr. 852 (1981) (affirming award of specific performance after seller's repudiation of contract where buyer's obligation to tender purchase price was conditioned on city's approval of development plans, giving buyer "reasonable time limit" to fulfill conditions); 81A C.J.S. 319, Specific Performance § 149 (2004) (in awarding specific performance, "the court ordinarily should follow and give effect to the terms of the contract"). Thus, we conclude that the trial court improperly found that Landmark failed to establish that the defendants caused

Landmark to suffer actual loss, and, consequently, improperly rendered judgment notwithstanding the verdict on Landmark's claim of tortious interference.

## II

We next consider Landmark's argument that it presented sufficient evidence from which the jury could find that the defendants acted with reckless indifference to Landmark's rights under the Landmark-Chung contract, thereby supporting the jury's determination that Landmark should be awarded common-law punitive damages.[15]

As this court recently reaffirmed: "In order to obtain an award of common-law punitive damages, the pleadings must allege and the evidence must be sufficient to allow the trier of fact to find that the defendant exhibited a reckless indifference to the rights of others or an intentional and wanton violation of those rights." (Internal quotation marks omitted.) *Hylton* v. *Gunter*, 313 Conn. 472, 491–92, 97 A.3d 970 (2014). Once again, "we are mindful that in reviewing the trial court's decision to render judgment notwithstanding the verdict, we may affirm that decision only if we find that the jury could not reasonably and legally have reached their conclusion. . . . The question is not whether we would have arrived at the same verdict, but whether, when viewed in the light most favorable to sustaining the verdict, the evidence supports the *jury's* determination." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, supra, 296 Conn. 346–47.

We agree with Landmark that the jury had before it sufficient evidence from which it could conclude that the defendants acted with at least reckless indifference to Landmark's rights. The jury was properly instructed that the "characteristic element" of recklessness "is the design to injure either actually entertained or to be implied from the conduct and circumstances." See, e.g., *Nolan* v. *Borkowski*, 206 Conn. 495, 501, 538 A.2d 1031 (1988). As we previously explained, the jury was free to infer from the totality of the defendants' conduct that their actions were all part of a concerted effort to obstruct Landmark's contractual rights, done with the purpose to prevent Landmark from being able to purchase the property so that the defendants could obtain it for themselves. Notably, their actions taken after Landmark won the judgment of specific performance indicated that, even after it was undeniable that Landmark had a right to purchase the property, the defendants were still taking any step they could to thwart the deal. The jury could infer through this and the defendants' other conduct that the defendants acted to purposefully interfere with Landmark's contractual rights. Although the trial court may not have drawn such an inference, "[o]nce drawn by the jury . . . that infer-

ence [was] more than sufficient to support a finding that the defendant acted in reckless indifference of [Landmark's] rights." *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, supra, 296 Conn. 348.

III

Finally, we turn to Landmark's claim that the trial court improperly directed judgment in the defendants' favor on its count alleging a violation of CUTPA. In granting the defendants' motion for judgment notwithstanding the verdict on this count, the trial court considered individually each of the defendants' acts on which Landmark relied in support of this claim and concluded that none of them was "immoral, unethical, or unscrupulous," and further concluded that Landmark did not establish a causal connection between the defendants' actions and Landmark's alleged losses so as to establish that it suffered an "ascertainable loss." Landmark challenges these conclusions and contends that the same evidence that supports its claim of tortious interference also shows that the defendants violated CUTPA. We agree.

"[Section] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . [I]n determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money . . . as a result of the use or employment of a [prohibited] method, act or practice . . . ." (Internal quotation marks omitted.) *Ulbrich* v. *Groth*, supra, 310 Conn. 409–10. "Because CUTPA is a self-avowed 'remedial' measure, General Statutes § 42-110b (d), it is construed liberally in an effort to effectuate its public policy goals." *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 756, 474 A.2d 780 (1984).

This court has recognized that, although "[c]onduct that might be actionable under CUTPA may not rise to a level sufficient to invoke tort liability . . . [t]he reverse of that proposition . . . is seldom true." Id. Indeed, we have noted that "it is difficult to conceive of a situation where tortious interference would be

found but a CUTPA violation would not." Id., 757. Moreover, "[w]hether a practice is unfair and thus violates CUTPA is an issue of fact," to which we must afford our traditional deference. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 43, 717 A.2d 77 (1998).

In the present case, the jury was instructed to find that the defendants' conduct was in furtherance of trade or commerce, so the only issues before the jury were (1) whether the defendants' conduct constituted an unfair trade practice, and (2) whether Landmark suffered any ascertainable loss. We agree with Landmark that it presented sufficient evidence to satisfy both of these elements and that the trial court therefore improperly rendered judgment in favor of the defendants.

With respect to the first question, that is, whether the defendants' conduct constituted an unfair trade practice, Landmark argues that the defendants' "overall scheme to wrest the property from [Landmark] . . . [constitutes] immoral, unethical, oppressive, or unscrupulous" conduct under the second prong of the cigarette rule. As we previously explained, the jury reasonably could have found that the defendants conduct, including, inter alia, the economic pressure exerted through the Calco-Chung contracts, was immoral, unethical, oppressive or unscrupulous. The trial court acted improperly when, rather than considering what inferences could have been drawn by the jury from the totality of the defendants' conduct, it parsed Landmark's allegations and concluded that each of the defendants' acts did not meet the standard necessary to prove a violation of CUTPA. In rendering judgment in favor of the defendants, the court commandeered the jury's role as fact finder.

We also agree with Landmark that it presented sufficient evidence from which the jury could have found that Landmark sustained an "ascertainable loss" as a result of the defendants' conduct. "An ascertainable loss is a loss that is capable of being discovered, observed or established. . . . The term loss necessarily encompasses a broader meaning than the term damage, and has been held synonymous with deprivation, detriment and injury. . . . To establish an ascertainable loss, a plaintiff is not required to prove actual damages of a specific dollar amount. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known." (Citations omitted; internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 218, 947 A.2d 320 (2008).

"A plaintiff also must prove that the ascertainable loss was caused by, or a result of, the prohibited act. General Statutes § 42-110g (a) . . . . When plaintiffs seek money damages, the language as a result of in § 42-110g (a) requires a showing that the prohibited act

was the proximate cause of a harm to the plaintiff. . . . [P]roximate cause is [a]n actual cause that is a substantial factor in the resulting harm . . . . The question to be asked in ascertaining whether proximate cause exists is whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's act." (Citation omitted; internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, supra, 287 Conn. 218.

For the same reasons set forth in part I B of this opinion, in which we concluded that Landmark presented sufficient evidence that it suffered "actual loss" to sustain its claim of tortious interference, we also conclude that the jury reasonably could have found that Landmark suffered an "ascertainable loss" under CUTPA. Although Landmark had not yet satisfied the contingencies in the Landmark-Chung contract, the jury reasonably could have found that the defendants' actions were the proximate cause of Landmark's loss, i.e., its inability to profit from the development of the property. The trial court's conclusion to the contrary was improper.

The judgment is reversed and the case is remanded with direction to render judgment for the plaintiff in accordance with the jury's verdict and for a hearing on the award of punitive damages.

In this opinion ROGERS, C. J., and PALMER and EVELEIGH, Js., concurred.

[1] We refer to the defendants individually as Calco and Senese, and, collectively as the defendants. Ralph Calabrese, Chung, LLC's real estate broker, and his agency, R. Calabrese Agency, LLC, were also named as defendants, but Landmark withdrew its complaint against them prior to trial.

[2] Landmark appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] Subsequent to the events of this case, the department merged into a new agency, the Department of Energy and Environmental Protection. See Public Acts 2011, No. 11-80, §§ 1, 55.

[4] The Landmark-Chung contract set a purchase price of $2.25 million with a deposit of $100,000, and was contingent on Landmark receiving approval for a site plan to include a minimum of 60,500 square feet of retail space; Calco's first offer was for a purchase price of $2 million with a $100,000 deposit, and was contingent on Calco receiving approval for a site plan to include a minimum of 60,000 square feet of retail space.

[5] The jury also found that Landmark should be entitled to punitive damages under CUTPA, but, because the issue of punitive damages under CUTPA is reserved to the sound discretion of the trial court, and not the jury; *Ulbrich* v. *Groth*, 310 Conn. 375, 450, 78 A.3d 76 (2013); this is a question that the court must consider in the first instance on remand.

[6] Landmark also argues that the trial court should not have reached this issue in the first instance because it was not raised by the defendants. Although we have serious reservations as to whether the defendants properly raised this issue before the trial court—notably, they did not request that the court instruct the jury that it could only consider evidence occurring prior to October 27, 2006—we nevertheless consider this question insofar as it relates to what conduct may properly be considered as part of a cause of action for tortious interference.

[7] Landmark also argues in the alternative, first, that the operative breach of the Landmark-Chung contract was in March, 2007, when the Calco-Chung contracts were executed, or, second, that if the Landmark-Chung contract was terminated as of the date of Chung, LLC's repudiation, then we should also consider evidence of the defendants' conduct occurring in 2011, after

the contract was " 'revived' " when the Appellate Court affirmed the trial court's judgment of specific performance. Because we conclude that the contract was not terminated as of the date of the repudiation, we need not consider these arguments.

[8] Cf. *Yaffe* v. *Glen Falls Indemnity Co.*, 115 Conn. 375, 378, 161 A. 521 (1932) ("Renunciation of an executory promise requires two things: On the part of the promisor a clear indication of a repudiation of his obligation under the contract, and on the part of the promisee an acceptance of that renunciation. *The contract remains a subsisting one until the parties have mutually elected to treat it otherwise, and have given unmistakable evidence of such an election.*" [Emphasis added; internal quotation marks omitted.]).

[9] We are not persuaded by the defendants' reliance on *Crown Equipment Corp.* v. *Toyota Material Handling, U.S.A., Inc.*, 202 Fed. Appx. 108 (6th Cir. 2006), in support of their argument that the jury could not consider evidence of the defendants' conduct occurring after Chung, LLC's repudiation of the contract. In that case, the court noted that, under Ohio law, a cause of action for tortious interference requires, inter alia, that "the defendant knew of the contract" and that "the defendant intentionally procured the breach of the contract . . . ." Id., 111. The court then found that the defendant did not intentionally procure the breach of the plaintiff's contract because the defendant did not *know* that its conduct may interfere with performance of the contract. Id., 112–13. More importantly, the plaintiff in that case elected to terminate its contractual relations with the breaching party upon learning of the breach; id., 110; so it could not be argued that there was any continuing contractual relationship with which the defendants could interfere. Here, however, the defendants *did* know that Landmark had a contract for the purchase of the property and that Landmark sought to enforce that contract through the specific performance action.

Furthermore, the defendants' reliance on New York cases that conclude that tortious interference is "not a continuing tort" for purposes of extending the statute of limitations; see, e.g., *Spinap Corp.* v. *Cafagno*, 302 App. Div. 2d 588, 756 N.Y.S.2d 86 (2003); is also unavailing because the defendants in the present case failed to pursue any claim that Landmark's cause of action was barred by the statute of limitations.

[10] Although the Calco purchase and sale agreement offered a lower purchase price, because it was an "as is" contract, the jury reasonably could have found that the Calco offer was superior to Landmark's—it promised a quick deal, and, for the insolvent Chung, ensured that he would be paid from the sale immediately, rather than having to place any of the proceeds of the sale in escrow while waiting for the property to be remediated.

[11] The trial court also concluded that Landmark's claim of actual loss failed because Landmark failed to prove that it mitigated its damages. We agree with Landmark, however, that the trial court improperly raised this issue sua sponte. Although a plaintiff does have a duty to make reasonable efforts to mitigate its damages, "[w]hat constitutes a reasonable effort under the circumstances of a particular case is a question of fact for the trier"; (internal quotation marks omitted) *Vespoli* v. *Pagliarulo*, 212 Conn. 1, 3, 560 A.2d 980 (1989); and "[t]he burden of proving that the injured party could have avoided some or all of his or her damages . . . rests on the party accused of the tortious act." (Internal quotation marks omitted.) *Preston* v. *Keith*, 217 Conn. 12, 21, 584 A.2d 439 (1991). Because the defendants never raised this issue and the jury was not instructed to consider it, it was improper for the court to raise it, sua sponte, after the jury had already returned its verdict.

[12] We are unpersuaded by the defendants' reliance on *Bridgeport Harbour Place I, LLC* v. *Ganim*, 131 Conn. App. 99, 30 A.3d 703 (2011), in support of their argument that Landmark failed to prove that it suffered actual loss. In that case, the Appellate Court concluded that a plaintiff was not entitled to present evidence of lost profits on a claim of tortious interference because any assessment of those profits was too speculative where the plaintiff and the seller had not yet entered into a contract to convey certain property that the plaintiff was to eventually develop. Id., 118. The preliminary agreement between the parties "did not provide for the construction of the project" but rather merely required that the defendant "engage in good faith negotiations to reach an agreement" regarding the cost, plans, and specifications of the construction. (Internal quotation marks omitted.) Id. That is not this case.

[13] Although the parties characterize the trial court's decision as concluding that Kane's testimony was *inadmissible*, we disagree with this characteriza-

tion. It is apparent that the court did not conclude that Kane's methodologies were unsound, so as to preclude admission of his testimony, but rather concluded that the jury could not have found Kane's testimony credible in light of the evidence. See, e.g., *State* v. *Porter*, 241 Conn. 57, 83, 698 A.2d 739 (1997) ("[o]nce the methodology underlying an expert conclusion has been sufficiently established, the mere fact that controversy . . . surrounds [the expert's] conclusion goes only to the weight, and not to the admissibility, of such testimony"), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

[14] The defendants argue that, as a matter of law, Landmark was not entitled to pursue the contingencies in the Landmark-Chung contract because when the Appellate Court affirmed the trial court's judgment of specific performance, it characterized that judgment as meaning that "Landmark should 'take advantage of the contract terms' to either terminate the agreement or close immediately on the property." *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 696. We disagree and note that the trial court's memorandum of decision in that case stated clearly: "Landmark is entitled to proceed *under the terms of the original contract* or [to] terminate at any point . . . ." (Emphasis added.) *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, Superior Court, judicial district of New Britain, Docket No. CV-075003201-S (August 19, 2009). The decision of the Appellate Court indicates that it found no error in the trial court's judgment granting specific performance, and, therefore, affirmed that judgment in its entirety; *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, supra, 125 Conn. App. 708; and we do not believe that the Appellate Court sought to alter the trial court's judgment sub silentio. See *Plasticrete Block & Supply Corp.* v. *Commissioner of Revenue Services*, 216 Conn. 17, 24, 579 A.2d 20 (1990) (Appellate Court may only reverse or modify decision of trial court if it determines that factual findings are clearly erroneous or that court made legal error). Although in support of their argument, the defendants rely on the trial court's statement that "any conditions of the contract that had *as yet* not been performed by Landmark are excused by Chung, LLC's repudiation of the contract"; (emphasis added) *Landmark Investment Group., LLC* v. *Chung Family Realty Partnership, LLC*, supra, Superior Court, Docket No. CV-075003201-S; it is clear that this statement meant that, had Landmark failed to perform any of the conditions under the contract *prior to* the order of specific performance, any such failure was excused by Chung, LLC's repudiation.

[15] Although Landmark contends that this issue was not properly before the trial court because the defendants did not raise it in their motion for judgment notwithstanding the verdict, we nevertheless consider it because it is an issue that will likely arise on remand. See *State* v. *Tabone*, 292 Conn. 417, 431, 973 A.2d 74 (2009) (addressing issue likely to arise on remand).